[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PETITION FOR TERMINATION OF PARENTAL RIGHTS
I
Jeremy R. is a boy born on April 13, 1987. Jeremy's mother is Wendy R. and his father is Raymond J.
Jeremy first came to the attention of the court when a request for an order of temporary custody ("OTC") was presented to the court and was granted ex parte on May 7, 1987. This OTC remained in effect until June 9, 1987, when by agreement of mother Jeremy was adjudicated a neglected child and was committed to the care and custody of the Commissioner of the Department of Children and Youth Services ("DCYS") for a period of 18 months ending December 9, 1988. On November 10, 1988 this commitment was extended to June 9, 1990 and subsequently was further extended to January 13, 1992.
On January 26, 1990 the Commissioner of DCYS filed her petition to terminate the parental rights ("TPR") of Wendy R. and Raymond J. in and to Jeremy. CT Page 4115
At the plea hearing on said petition held on February 21, 1990, Jeremy's father Mr. J., appeared, was appointed counsel and entered denials to the allegation of the petition. Pro forma denials were entered on behalf of Wendy R. as well.
On July 3, 1990, the motion of Jeremy's paternal, grandmother, Eliza J., to intervene as an equitable party at interest was granted by the court (Barnett, J.). Eliza J. was admitted as a party for both adjudicatory and dispositive phases of the TPR proceedings. On September 12, 1990 the court (Goldstein, J.) found that mother, Wendy R., had voluntarily and knowingly given her consent to termination of her parental rights in and to Jeremy and the court accepted mother's consent.
A hearing on the petition to terminate parental rights opened on November 19, 1990 and continued on November 20, December 10, December 14 and December 17 when the parties rested. Briefs were filed by the parties on or about January 23, 1991 and at the request of counsel for the paternal grandmother, Mrs. J. the hearing was reopened for supplemental oral arguments held on March 6, 1991.
 II
In her petition the Commissioner alleges as grounds for termination of mother's parental rights voluntary consent. Such consent having been accepted by the court, the termination of the parental rights of Wendy R. in and to her son Jeremy R. is hereby confirmed.
 III
With regard to father, the Commissioner alleges that Jeremy has been abandoned by the father in the sense that father has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child, that the child has been found in a prior proceeding to have been neglected or uncared for and that the father has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, father could assume a responsible position in the life of the child; that there is no on-going parent-child relationship with respect to the father which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of the parent-child relationship would be detrimental to the best interests of the child; further, that the above-mentioned reasons have existed for not less than CT Page 4116 one year.
 IV
The history of this child and his parents has elements both of chance and pathos.
Briefly summarized, Raymond J. and Wendy R. were patients at the Yale Psychiatric Institute ("YPI") in the summer of 1986. During their stay at YPI they met and conceived Jeremy, born the following April. Wendy had left YPI in August of 1986 and at the time of Jeremy's birth, mother was a patient at Connecticut Valley Hospital ("CVH") in Middletown. Following mother's departure from YPI, Raymond and Wendy had lost contact with each other. It was not until January, 1990, when Raymond was admitted for treatment at CVH that he encountered Wendy and was told that he was the, father of a son. Raymond promptly contacted his mother, Eliza J. and DCYS and, as noted, appeared in court to contest this petition.
Raymond J. has a "dual diagnosis," suffering both from drug/alcohol dependency and paranoid schizophrenia. He hopes one day to fulfill the role of parent but acknowledges that at present he is unable to do so. He asks that this TPR petition be dismissed and that his mother, Eliza J., be allowed to assume the care and custody of Jeremy.
Jeremy at birth suffered from a seizure disorder, apparently caused by his reaction to his mother's ingestion of medication while pregnant. Although he was weaned from said medication by age 4 1/2 months and seizures stopped when he was about 1 1/2 years of age, he has abnormal neurology.
Jeremy R. at the time of his discharge from Middletown Hospital in May of 1987, was placed in the foster home of Francine M. and has lived with Ms. M. ever since. It is undisputed that Jeremy is strongly "bonded" to Ms. M. and that Ms. M. is Jeremy's psychological mother, that is, the person he sees as his mother, the person who fulfills that role for him.
Prior to father's encounter with mother at CVH, father had been whereabouts unknown both to the DCYS and to the court. Following Jeremy's birth DCYS was able to ascertain from mother father's name and that he was from New Haven. Father was given notice by publication of the neglect hearing and of the subsequent hearing on extension of commitment.
Following the hearing of February 21, 1990 a visitation schedule was established and in the ensuing months Jeremy has had a number of visits (some 19 at time of trial) at Eliza J's home CT Page 4117 some of which have included father, Raymond J. Both Raymond and his mother Eliza participated in court-ordered evaluations, one conducted by clinical psychologist David Mantell in July of 1990, and another by clinical psychologist Kathryn Clegg in December, 1990.
 VI
The termination of parental rights is "a most serious and sensitive judicial action," In re: Jessica M., 217 Conn. 459 at 464, quoting from Anonymous v. Norton. 168 Conn. 421, 430,362 A.2d 532, cert. denied, 423 U.S. 935, 96 S.Ct. 294,46 L.Ed.2d 268 (1975). The interest of parents in their children is a fundamental constitutional right, In re: Jessica M., supra at 464. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. In re Jessica M., supra at 465, quoting from Santosky v. Kramer, 455 U.S. 745, 573, 102 S.Ct. 1388,71 L.Ed.2d 599 (1982).
To effectuate a non-consentual termination of parental rights a petitioner must prove first, by clear and convincing evidence, the existence of at least one of three statutory grounds for termination set forth in General Statutes 45a-717 (f). If a, statutory ground for termination is so established, the court must proceed to make the six written findings required by General Statutes, 45a-717 (h) before moving on to determine whether termination is in the best interests of the child. At this dispositional stage, petitioner must prove by clear and convincing evidence that the termination sought is in the child's best interests. "Consideration of the best interests of the child cannot vitiate the necessity of compliance with the statutory criteria for termination." In re Jessica M, supra, at 465. In re Barbara J., 215 Conn. 31, 45. Nor can the court consider the availability of an appropriate adoptive home as bearing on the issue of establishing a statutory ground for termination; In re Jessica M., supra, at 466.
 VII
In the adjudicatory phase of these proceedings the court, in determining whether the statutory grounds alleged are established, is confined to events occurring before the latest amendment to this petition, September 12, 1990. See In re Shannon S.,41 Conn. Sup. 145, 146.
Petitioner first alleges abandonment by father as a ground for termination of father's parental rights. Abandonment here means failure to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. It would be CT Page 4118 harsh indeed and defying logic to demand that a parent maintain any degree of interest in a child of whose existence he is unaware. Petitioner appears to concede as much in her brief. The court finds that Raymond J. has manifested a reasonable degree of interest, concern and responsibility as to Jeremy's welfare since Raymond J. first became aware of Jeremy's existence. Petitioner has failed to establish abandonment by father by clear and convincing evidence.
As to the second ground alleged for termination, the court finds that Jeremy was found neglected on May 7, 1987.
The state alleges and must prove by clear and convincing evidence that father has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, he could assume a responsible position in the life of the child.
"Personal rehabilitation" here means the successful effort by Raymond J. to alter his condition and circumstances in such a way as to enable him to play a "constructive and useful role as a parent." Such rehabilitation does not "require the parent to be able to assume full responsibility for a child, without the use of, available support systems." In re Migdalia M., 6 Conn. App. 194,203.
In Raymond J's case, such rehabilitation would necessarily include a sustained effort to receive treatment for his two illnesses, drug/alcohol dependency and paranoid schizophrenia. The record is clear that Raymond continues to make such an effort. The petitioner has failed to show that such efforts are inadequate or futile.
Rather petitioner appears to rely on Raymond J's history of mental illness and his admission that he is presently unable to assume the responsibilities of parenting, coupled with his offering of Eliza J. as caretaker for his son, to demonstrate his failure to rehabilitate. From these facts the court is invited to assume that Raymond J. is unlikely to be able to assume a responsible position in the life of his son in the foreseeable future. Such assumption cannot constitute proof by clear and convincing evidence. The burden is not on Raymond J. to prove his prognosis for recovery within a reasonable period of time is good; the petitioner has the burden of proving otherwise.
Raymond J. in offering his mother, Eliza J., as primary caretaker of Jeremy seeks to provide a needed "support system" for his parenting and thus to assist him in playing a constructive and useful role as a parent. As such, she is a component of his CT Page 4119 personal rehabilitation.
Raymond also aggressively sought and faithfully participated in visitation. He had begun a positive relationship with his son by September 12, 1990.
The court finds that petitioner has failed to establish by clear and convincing evidence that respondent father, Raymond J., has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, Raymond could assume a responsible position in the life of Jeremy.
The third ground for termination alleged by petitioner is: no on-going parent-child relationship with respect to father.
As of September 12, 1990 Raymond J. had visited with Jeremy less than 5 times, each visit lasting no more than an hour. Raymond has never met Jeremy's physical, emotional, moral and educational needs on a continuing, day-to-day basis. Dr. Mantell observing Raymond and Jeremy interacting in July, 1990 concluded that there was no relationship between the two. Ms. Vasquez, a DCYS social worker who observed later visits between Raymond and Jeremy testified that they interacted as two peers, as children do playing together. While Jeremy had some 19 visits with Eliza J., his relationship with her was less comfortable than with Raymond and cannot be characterized as a parent-child relationship. In contrast, Jeremy was strongly bonded to Francine M. who is his psychological mother and "the centerpiece of his life," (Dr. Mantell) and is closely bonded to Francine M.'s two adopted children. Jeremy is an emotionally fragile (Dr. Mantell) child with special needs which are being met. The evidence has established that an effort to transfer Jeremy psychologically and emotionally from Francine M. to Mrs. J and Raymond as new psychological parents would be complex, difficult for the child, fraught with risk to the child's emotional and mental well-being and problematic of success.
The petitioner has proven by clear and convincing evidence that there is no on-going parent-child relationship between Raymond J and Jeremy, and that this situation has lasted no less than one year. That having been established, the court must determine whether to allow further time for the establishment of an on-going parent-child relationship would be detrimental to the child's best interest. Based on the facts existing as of September 12, 1990, the court must and does find, by clear and convincing evidence, that to allow further time to establish such relationship would be detrimental to the child's best interest.
However, as will be seen below, the court when permitted to CT Page 4120 take into consideration facts and events transpiring up to the close of the evidentiary hearing, reaches a contrary conclusion in making a determination as to whether termination is in the child's best interest.
 VIII
The statutory ground for termination having been established, the court proceeds to make the findings required by General Statutes 17-112 (d); all by clear and convincing evidence: 1. Regarding timeliness, nature and extent of services offered or provided to facilitate the reunion of the child with the father: DCYS has arranged-for regular visitation between the child and Eliza J. and on occasion with Raymond J. and transported the child to and from Eliza J.'s home for visitation. Over 20 such visits were held between March and December, 1990.
2. As to any court orders entered into, and agreed upon by DCYS and father and Eliza J: Father and Eliza J. agreed to participate in two court-ordered custody evaluations and did so participate. One was conducted by David Mantell, Ph.D. in July, 1990 and the, other by Kathryn Clegg, Ph.D. in December, 1990.
3. Regarding the feelings and emotional ties of the child with respect to his parents and guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties:
In their few contacts the child and Raymond J. have established a positive relationship, but one more closely resembling that between playmates than a parent-child relationship. Jeremy has established a friendly, positive relationship with his paternal grandfather, James J. Jeremy's relationship with Eliza J., his grandmother while not devoid of positive elements, is less easy than with Raymond or James J., is "conflicted." (Dr. Clegg). Jeremy has a strong, warm relationship to Francine M., his caretaker from infancy. Jeremy views Francine as his mother and is deeply attached to her. He views her adopted children as his siblings.
4. Jeremy is just over four years old.
5. Regarding efforts the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return him to his home in the forseeable future: Raymond J. has, since learning of his son's existence, made persistent efforts to adjust his circumstances, conduct and conditions by continuing in treatment for his alcohol/drug dependency and mental illness, by enlisting the aid of Eliza J. as CT Page 4121 a parenting resource for his son; and by visiting his son.
6. Regarding the extent to which father has been prevented from maintaining a meaningful relationship with the child by the, unreasonable act or conduct of any person or by father's economic circumstances: Father has not been prevented from maintaining such relationship by his economic circumstances.
Respondents have urged that DCYS failed to make reasonable efforts to determine Raymond's whereabouts after the birth of his son as a predicate to Raymond's having the opportunity to establish a relationship with Jeremy from infancy. While much grief and confusion might have been averted had DCYS managed to contact Raymond, its action — seeking father's name and address from mother, then noticing father by publication, meets statutory notice requirements, and was in the circumstances, not unreasonable.
 IX
The adjudicatory phase having been completed, the court is required to determine whether, by clear and convincing evidence, it is in the best interest of Jeremy that Raymond J's. parental rights be terminated. Any rights of Eliza J. as to Jeremy derive from Raymond and would be extinguished were Raymond's parental rights terminated.
In making the determination as to Raymond's parental rights, the court may rely on evidence of matters occurring up to the close of the evidentiary hearing.
In the course of the hearing two competing caretakers for Jeremy emerged, Francine M, his foster mother, and Eliza J., his biological grandmother. The evidence presented indicated that both women are equipped to parent. The task of the court, however, is not to select a caretaker for Jeremy. "[A] parent cannot be displaced because `someone else could do a "better job" of raising the child. . .'" In re Jessica M, supra 467, quoting from Carey L. v. Martin L., 45 N.Y.2d 383, 391, 380 N.E.2d 266,408 N.Y.S.2d 439 (1978).
In the circumstances of this case the court's task is to determine whether Jeremy, a child with special needs, strongly bonded to a competent and devoted foster mother, who seeks to adopt him, should remain legally tied to his biological family. If his father's parental rights are not terminated, it is reasonable to anticipate that Jeremy will be subjected to a complex and delicate effort to move him from primary psychological and emotional dependence on Francine M. as his psychological mother, to psychological and emotional membership in his CT Page 4122 biological family, with Eliza J. filling the role of mother and primary caretaker.
In reaching disposition the court has access to facts not, available to it during the adjudication phase of this proceeding. From September 12, 1990 to December 17, 1990 additional visits took place at Eliza J's. home between Jeremy and Eliza and other members of Jeremy's biological family. In December of 1990, Dr. Clegg conducted her evaluation and observed Jeremy's interaction with Eliza J., Raymond J., and James J., as well as with Francine M. Dr. Clegg's observations and insights as presented in testimony may properly be utilized by the court in reaching disposition. Ms. Vasquez of DCYS testified that in visits occurring after September 12, 1990, Jeremy appeared more at ease and was less resistant to visitation with the J. family.
While Dr. Mantell saw no relationship in July between Raymond and Jeremy, Dr. Clegg in December saw a positive relationship between the two. In July Dr. Mantell saw Jeremy as an "emotionally fragile" child. In December Dr. Clegg saw no sign of emotional fragility; rather, Jeremy showed "emotional strength," "good ego strength." Raymond J., James J. and Eliza J. also testified as to the state of their relations with Jeremy.
By December, 1990 the court finds that Jeremy had established a positive relationship with his father and with his grandfather, James J. Jeremy and Eliza J. have a relationship, which, while not devoid of positive elements is described by Dr. Clegg as "conflicted." There is no indication that Jeremy is in any way dependent on these relationships or any of them as he is on his relationship with Francine. It is undisputed that Jeremy is strongly bonded to Francine M. and her children, that Francine has cared for Jeremy's special needs and has shown herself to be a competent, devoted foster mother.
Petitioner argues that termination of Raymond's parental rights is in Jeremy's best interest. The testimony of petitioner's witnesses evidenced grave apprehension that an effort to transfer Jeremy's filial allegiance from Francine M. to another, presumptively Eliza J., would have serious negative effects on Jeremy. This apprehension is based inter alia on the extensive experience of Dr. Mantell and Robert Powell of DCYS with other children similarly situated as well as Jeremy's initial resistance to visitation with the J's; Jeremy's special needs; the child's emotional and psychological ties to Francine M.; and the uncertainty of Raymond's medical prognosis.
Petitioner's apprehensions do not rise to the level of clear and convincing proof. The court finds that petitioner has failed to prove by clear and convincing evidence, that termination of CT Page 4123 Raymond J's. parental rights is in Jeremy's best interest.
The court recognizes that the apprehensions of the petitioner, of the impact of a reunification effort on Jeremy, are not unfounded. The child, of course, remains in the care and custody of the Commissioner of DCYS, who is obliged to take action, consistent with the safety of the child, to effect reunification. In re Juvenile Appeal (84-AB), 192 Conn. 254, 258. The situation calls for a good faith effort by all the adults concerned, under the guidance of a dedicated professional, at building and solidifying a relationship, In re Juvenile Appeal (Anonymous), 177 Conn. 648, 676, between Jeremy R. and his biological family. The court expresses no opinion as to the outcome of such efforts but expresses its hope that all adults concerned will strive to act in the best interest of Jeremy R.
The petition of the Commissioner of the Department of Children and Youth Services to terminate the parental rights of Raymond J. in and to his son Jeremy R. is denied.
JOHN T. DOWNEY, JUDGE