[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of this proceeding
Seventeen months after being placed in foster care at the age of two weeks, William A. III became the subject of this petition by which the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of Sheila W. and Willie A., Jr., his mother and acknowledged father, pursuant to the provisions of Sec. 17-43a of the Conn. Gen. Stats. (Rev. 1990, now renumbered Sec. 17a-112, Rev. 1991) so that he may be placed in a permanent home through adoption. The parents, served by publication in the absence of known current addresses, both appeared at the initial hearing on February 19, 1991, represented by the same attorney who had appeared for them at the time their son was committed to DCYS as neglected and uncared-for on April 17, 1990.
At a pretrial conference on March 7, 1991 a trial date certain was set for May 24, 1991, allowing sufficient time to secure a clinical evaluation of the child, his parents and foster parent. Eleven days before the trial date, after a second court hearing and a second pretrial conference held May 2, 1991, counsel for the parents filed a motion for the appointment of separate counsel for the father, giving a possible conflict of interests between the parents as the reason. This motion was granted ex parte on the specific condition that the trial not be delayed. Trial was completed on May 24, 1991 as scheduled. The father testified on his own behalf; the mother offered no evidence. All parties were given permission to submit trial memoranda no later than June 21, 1991, the date upon which the period of reserved decision was deemed to commence.
Facts
Evidence offered at trial, interpreted in the light of the prior court record concerning this child, of which judicial notice is taken, permits the finding of the following facts:
Sheila W., who suffered from a venereal disease at the age of four while living with her mother, spent the next nine years living with her father before being committed to DCYS at the age of 13. Her relationship with Willie A. Jr. began not long after, and their first child was born on September 12, 1988, when Sheila was seventeen. Willie III, their second child, was born ten months later, on July 29, 1989. A third child was born a year after Willie III.
Sheila had not sought prenatal care when pregnant with Willie III until two months before his birth, and she later admitted using cocaine on a regular basis throughout her CT Page 4947 pregnancy. Although both she and the one month premature infant tested positive for cocaine at the time of the birth, she was permitted to take him home at the age of two days, with referrals made to DCYS and the Visiting Nurses (VN) to ensure adequacy of care. Neither agency saw the child, however, until he had been home for ten days. On August 10, 1989 the (VN) found the mother and older child sleeping on a floor crawling with cockroaches, the newborn in an infant seat nearby. After finally arousing Sheila, the visiting nurse made an appointment to return the next day. On her return the nurse noted the unsanitary conditions of the home and was concerned that the mother had not been sterilizing bottles or nipples despite the heavy cockroach infestation, and that she was feeding the child powdered milk after running out of formula. The baby did not respond to loud noises, was slow to respond, and his "nutritional status was inadequate." (Affidavit submitted with neglect petition filed December 12, 1989). In the week following, the DCYS social worker returned with the nurse and found filth and unsanitary conditions throughout the apartment, as well as cockroaches in the proximity of the infant who by now was displaying a spreading red "beefy" diaper rash. On August 17, 1989 Sheila signed a voluntary permission to place the child in foster care, and two weeks later reported to DCYS that she had become homeless. A neglect petition was filed four months after the child's placement.
On April 17, 1990, after their son had been placed for eight months, both parents appeared in court represented by counsel. They acknowledged Willie Jr.'s paternity, admitted that the baby had been both neglected and uncared-for, and agreed to his commitment to DCYS for an initial period of 18 months, pursuant to the provisions of Sec. 46b-129, subsection (d). They also agreed with the expectations of the court determined to be necessary for the child to be returned to their care. Keeping DCYS and their attorney informed of their whereabouts, visitation at least once a week; avoidance of substance abuse; a drug abuse assessment for Sheila with adherence to recommended treatment; the securing of adequate housing.
The parents, who had visited the child only twice in the four months between his placement and the filing of the neglect petition, visited twice more in January of 1990 and then not again until after commitment three months later. Following commitment they visited weekly for three weeks, once in May, once in July, once in August, and then not again for five more months until after this termination petition was filed. (Testimony of social worker Jordan, May 24, 1991). There was thus a total of only ten visits in the child's first 16 months of foster care. While the foster family had moved twice in CT Page 4948 this period, the phone number, which had been given to the parents, had never changed, nor had that of the DCYS worker who had been aware of the foster parents' address at all times. On January 24, 1991, after not visiting Willie III for five months, Sheila called the social worker to obtain the foster family's address and telephone number which she said she had lost. Neither parent ever asked DCYS for help with transportation to the foster home which, for much of the time, was within walking distance of their homes.
The parents initially lived with the paternal grandparents for several months after their son's commitment. When they separated, Sheila went to live with her father until he was evicted from his apartment. Then she stayed with her sisters and, at the time of trial, was reported to have been living in an abandoned warehouse. Willie Jr., after the separation, lived at the South Park Inn, in preference to remaining with his parents. At no time since the child was placed in foster care in August of 1989 have the parents offered a place where the child could live with either.
DCYS referred Sheila to Community Health Services for a drug abuse assessment. At semi-annual administrative reviews of the child's treatment plans, which Sheila attended, she was reminded of this expectation of the court. She never secured an assessment . Six months after the birth of her third child in August of 1990, Sheila explained that her failure to keep her first appointment for the court-ordered psychological evaluation was because she had been at Hartford Hospital following a miscarriage. While this was never verified (Hartford Hospital reported to DCYS that Sheila had not been there on the date in question), if true it would have been her fourth pregnancy in less than three years.
In his own behalf, Willie Jr. gave a variety of excuses for his failure to visit his son: He was too busy working; he was looking for a job; he had lost the telephone number of both the foster mother and DCYS; he had to care for his youngest child, born August 13, 1990, after May 1, 1991. At different times in his testimony he claimed to have visited the child every day for one period of time; then every weekend; then not at all because he wanted to secure employment before visiting. Sheila did not testify.
In his clinical examination, Willie Jr. placed blame on others — Sheila; DCYS; the foster family — for his failure to comply with court expectations. He claimed he had not used drugs since January of 1991 but asserted that Sheila continued to use drugs. (State's Exhibit A, p. 1). He acknowledged that they had both been freebasing cocaine. He explained his CT Page 4949 preference for living at a shelter to living with his parents because he liked having "his own place." (Id., 2). The psychologist found him to have "marginal adult functioning" with personal problems that prevented him from living independently, working steadily, or functioning effectively as a parent. (Id.) His recent three-month freedom from drug abuse could not be relied upon to continue "because of his lack of treatment or other support in remaining drug free," (Id.) While some of his interactions with the child had been unexceptional, Willie III ". . . was obviously unhappy and showed little comfort with his father" as well as "minimal recognition" of him. (Id., p. 3) Lacking language suitable for communicating with a nearly two-year-old (he had told his son to "chill out" at one point in their meeting, Id.) or any evidence of parenting skills, his interaction with the child "was of poor quality . . . without evidence of closeness" and "tended to draw out regressive, anxious behavior from . . . [the] child." (Id.)
During the portion of the evaluation that Sheila attended, she claimed she had stopped using drugs and had not secured the expected drug assessment because "no one had told her where to go for this." (Id., p. 4). She, too, gave a variety of excuses for failing to visit her child — "business"; other children to care for; the foster family's move — and for not having secured even temporary housing appropriate for children:
 Sheila showed signs of many significant problems, and did not seem likely to be a competent parent, even for her daughters. She was unable to obtain housing, and moved between her father's house where drugs were being used on a regular basis, Willie's parents' house, which DCYS found unsuitable for children, and now another sister's house. It should be noted that she would certainly known [sic] that all these places would be unsuitable to DCYS and that all her moves were to another unsuitable place, and only when she was forced to move. Sheila seemed to be overwhelmed by the pressures of her life, unable to match even the tasks of raising her children, much less meet any expectations for the return of her son. With constant pregnancies, she jeopardized her health and the health and safety of her children, and there was no evidence that she did anything to help with her drug problem. (Id.) CT Page 4950
When seen with his mother, Willie III "showed no real comfort or ease with her" and to the evaluator ". . . it was clear . . . that there was basically no established relationship between mother and son." (Id., p. 5). While she showed more parental skills than did the father, "her lack of visiting and other problems prevented any parent-child relationship from ever developing." (Id.) This was in sharp contrast to the child's interaction with the foster mother which evidenced "a lot of mutual affection and attachment." The psychologist concluded that the child's "excellent development in cognitive, emotional and motor areas was obvious and this could only be attributed to her excellent care." (Id.) The evaluation concluded with a clear recommendation:
 After a substantial period of placement, the forming of other primary relationships for Willie III, with no substantial sign of compliance with reasonable expectations for reunion, and with little sign of rehabilitation in either parent, there is no justification for delaying the TPR action (Id., 7).
In his testimony, Dr. Freedman stated that he saw no indication that the lack of parenting skills in either parent would improve since their lifestyles continued to be as unstable as when Willie III had been initially placed nearly two years earlier. He had found Sheila to be "in pretty bad shape," evidencing continued drug abuse and "overwhelming personal problems," such as drifting from one unsatisfactory living situation to another, while giving varying unconvincing excuses for her failures. He found no potential for her to develop a relationship with the child in the foreseeable future. He had seen Willie III to be "a different child" when with the foster mother — happy, comfortable and energetic — as opposed to his fussy, uncomfortable manner when with his biological parents. Dr. Freedman recommended adoption by the foster family, if possible, but if they were unable to adopt, the child would be better served by permanent placement with adoptive strangers than to wait longer than his lifetime to date for either biological parent to make a reasonable plan for his case. While Willie III had briefly shown some slight recognition of his father, and brief moments of comfortable interaction with each parent, there was "absolutely" no indication of any parent-child relationship existing between the child and either parent. In the opinion of this witness, who qualified as having special expertise in the treatment of drug abuse, it would be "close to impossible" for the parents to stop drug abuse without treatment. The father's three-month period of abstinence was not seen as significant; it would take 12 to 18 months of abstinence to be significant of a lasting CT Page 4951 recovery. Despite Sheila's claim to have stopped using drugs, Dr. Freedman found no evidence of this in his interview with her.
Adjudication — on facts as of the date of filing, 1/24/91
The petitioner failed to offer any evidence to support the allegation that this child, since placement in foster care in August of 1989, has suffered any denial of necessary care, guidance or control by acts of his parents or any other person charged with responsibility for him. Consequently this ground for terminating his parents' rights is dismissed.
The state has, however, offered evidence that supports by clear and convincing proof the other three nonconsensual grounds pleaded for the termination of the parental rights of both Sheila W. and Willie Jr.;
(1) Abandonment — Instead of the weekly visitation agreed to at the time Willie III was committed, the parents visited an average of less than once every six weeks in the nine months following his commitment. While this was an improvement over the average of once every eight weeks that they had visited in the eight months of foster placement preceding commitment, their total contacts with their son — ten times in sixteen months — do not constitute a "reasonable degree of interest, concern or responsibility" as to the child's welfare sufficient to defeat the conclusion that the child was abandoned as that term is defined in Sec. 17-43a, subsection (b). Abandonment for this purpose must be determined by the manifestations of such interest, concern or responsibility to the child, not by what might have been intended by the non-visiting parent. (2) Failure to rehabilitate — The Connecticut Appellate Court has referred to "personal rehabilitation" as "the restoration of a parent to his or her former constructive and useful role as a parent." In re Rayna M., 13 Conn. App. 23, 32 (1987).
In this case, during the 17 days that Willie III lived with his parents, he was in a filthy apartment, teeming with cockroaches, being fed inadequately on powdered milk instead of formula and developing a serious spreading diaper rash. It is questionable from this whether his parents could be regarded as ever having exercised any "constructive and useful role" in his life. Even if they had, the situation of both parents on January 24, 1991 was farther from being adequate to care for him than it was during those 17 days, or than it was at the time of his commitment:
— Neither parent has a home. CT Page 4952
— Neither parent kept DCYS informed of their whereabouts at all times.
— Neither parent has sought drug treatment.
— They produced a third child born to them in 23 months, just one year after Willie III was placed in foster care.
This is overwhelming evidence that these parents ". . . of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child." (3 No ongoing parent-child relationship — Dr. Freedman's observations confirmed what even a lay trier of fact could reasonably have predicted from the fact that a child, removed from parents at the age of two weeks, has only seen his parents ten times in the next sixteen months: Such a child could not have, with these parents, the kind of relationship that
 . . . ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child
as the statute defines such relationship. Even considering the modification of the statutory definition required by the opinion in In Re Jessica M., 217 Conn. 459 (1991), such relationship does not exist: Under the circumstances of this case, no child could have — and the interaction of Willie III with each parent was observed to lack — any sign of present memories of or positive emotional ties with either parent. Considering the chaotic, directionless, dependent pattern of both their lives, it is equally clear that "to allow further time for the establishment . . . such parent-child relationship would be detrimental to the best interest of the child."
Disposition — on facts as of 5/24/91, the trial date
Having determined that three grounds existed for terminating the parents' rights on January 24, 1991, the court must next consider all changes in circumstances as of the final day of trial, May 24, 1991. In the four months since the adjudicatory date, the parents visited the child a number of times in February, but the frequency was not sustained. Sheila has again become homeless and handed over the care of her two other children to others. Willie Jr. reported that he was now caring for the youngest child and had secured an apartment, CT Page 4953 changes that took place only three weeks before trial. He did not notify DCYS he had secured an apartment, nor did he request that Willie III join him there. No other changes were reported by either party.
Before a parent's rights may be terminated, the court must consider the six factors set forth in subsection (d) of Sec. 17-43a: 1) The DCYS social worker gave the parents the foster family's address and telephone number, permitted them to make their own arrangements for visitation, and repeatedly referred Sheila to an agency where a drug assessment could have been obtained. Neither parent ever asked for help with transportation to visits, and no requested visit was ever refused. DCYS could do no more to facilitate reunification of this family. Indeed, the failure of DCYS to file a neglect petition immediately upon placing Willie III in foster care in August of 1989 and its later failure to file a petition to terminate parental rights in August of 1990 — twelve months after foster placement — suggests an extraordinary effort to return Willie III to his parents, or to either of them. Unfortunately, the passage of time did not result in either parent moving closer to a position where the child could be safely returned, and nothing in evidence supports an inference that the passage of still more time would produce a different result. 2) The parents were not ordered to do anything except appear in court and attend the clinical evaluation. This they did, with the exception of Sheila's having missed her first clinical appointment for which no verified reason was given. While not orders, the expectations of the court which were signed by both parents and their attorney at the time of their son's commitment to DCYS, have been wholly unfulfilled. Neither parent has secured housing, remained drug free, or visited the child weekly — indeed, the visitation was never even as often as monthly until the parents began a flurry of visits after being served with the instant termination petition. 3) Dr. Freedman's conclusion was unequivocal and unrefuted that the child has a normal and nurturing parent-child bond with his foster mother while giving no indication of having any relationship with either biological parent. 4) Willie III turns two years old two months after the dispositional date of this proceeding. Having spent all but the first two weeks of his life in a foster home in which he has thrived and which is now willing to adopt him, it is clear that his best interests will be served by assuring him of permanency in that home. To wait longer than the two-year lifetime he has already waited to know where his true "home" is would be clearly detrimental to his development. 5) Neither parent has made any visible effort to adjust their circumstances, conduct or conditions to make it in the best CT Page 4954 interest of Willie III to return to the home of either parent in the foreseeable future. Sheila has no home, and has relinquished care of her two other children. Willie Jr. assumed care of the youngest child and reported having secured housing for the first time in two years — three weeks before the trial. Based upon his prior history, it is purely speculative if he will maintain this present menage for any period of time and, if he does, if he would take any steps toward including Willie III in it. The infrequent visitation in the past and the paucity credible excuses offered suggests that it is highly improbable that the father would be able to do either. 6) Nothing prevented either parent from maintaining a meaningful relationship with this child, if, indeed, a relationship has ever existed which could have been maintained. The parents were given unlimited access to the foster home and for many months lived only a short walk away from it. The. parents' decisions to continue freebasing cocaine and to have another child every year would appear the more likely reason. why a meaningful relationship was not sustained.
Having considered the foregoing, and mindful of the clear recommendation of the clinical psychologist, it is found, by clear and convincing evidence, to be in the best interest of Willie III for his parents' rights to be terminated so that he may be adopted without further delay. It is therefore ORDERED that the parental rights of Sheila W. and Willie A. Jr. in and to their son Willie A. III be and hereby are terminated. And it is further ORDERED that the Commissioner of Children and Youth Services be appointed statutory parent for the purpose of placing the child forthwith in adoption and to report to this court in writing as to the progress toward such end no later than 90 days from the date of this judgment. If adoption has not been finalized by October 1, 1992, the said Commissioner is further ORDERED to submit a a Motion to Review Plan for Terminated Child no later than that date to ensure compliance with federal law that mandates judicial review of every child in the guardianship of the state at least every eighteen months.
Appeal
The parents have 20 days from the date of this judgment in which to take an appeal. If an appeal is requested and trial counsel are willing to continue representation, this court will appoint those attorneys to act as appellate counsel, at public expenses, if the appellant is indigent, until all appellant process is completed. Practice Book 4017. If, however, in the exercise of professional judgment as officers of the Superior Court, the attorneys decline to perfect such appeal because, in the attorneys' opinions, it lacks merit, CT Page 4955 they are not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Practice Book 4040. Such motions, if unopposed, will be granted ex parte and new attorneys appointed to review this record and make an independent determination of the merits of such appeal. If the second attorneys determine it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The parties seeking the appeal will then be informed by the court clerk that the parties have the balance of the 40 days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke, 152 Conn. 501 (1965).
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of a third party involved: those of the child whose interest in achieving permanent nurturing parents without unnecessary delay is entitled to at least as great a degree of consideration as those of the parents whose rights to raise the child are at issue. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process is exhausted.
Entered at Hartford this 28th day of June, 1991.
BRENNEMAN, J.