IN RE JESSICA M.*
(14106)

PETERS, C. J., SHEA, CALLAHAN, GLASS and HULL, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 2026, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Supreme Court.

Reporter of Judicial Decisions

Argued December 13, 1990—decision released February 12, 1991

*Susan M. Cormier,* with whom were *William R. Moller, Robert B. Katz* and, on the brief, *Wesley W. Horton,* for the appellant (respondent).

*Barbara J. Ruhe,* with whom was *Jonathan W. A. Ruhe,* for the appellees (petitioners).

*Sue Ann Shay,* with whom was *Ann Hodgdon,* for the minor child.

*Clarine Nardi Riddle,* then attorney general, and *Mary-Anne Ziewacz Mulholland* and *Judith Merrill Earl,* assistant attorneys general, filed a brief for Amy B. Wheaton, commissioner of the department of children and youth services, as amicus curiae.

PETERS, C. J. The dispositive issue in this appeal is the proper construction of General Statutes § 45-61f (f) (3),[1] which authorizes termination of parental rights if there is "no ongoing parent child relationship." The trial court, acting on the petition of the child's legal guardians, relied on this statutory provision to terminate the parental rights of the respondent, the child's natural mother, on the basis of the court's finding that the natural mother is not the "psychological parent" of her child.[2] The respondent appealed to the Appellate Court and we transferred the appeal to this court pursuant to Practice Book § 4023. We reverse.

The petitioners, a paternal aunt and uncle[3] of the child who is the subject of this proceeding, have been the child's legal guardians since February 23, 1988. On June 29, 1989, they filed a petition to terminate the parental rights of the respondent, who is the child's sole surviving parent, so that they could adopt the child and end what they perceived as a conflict in the child's loyalties caused by the respondent's visitation. Pur-

[1] General Statutes § 45-61f (f) provides in relevant part: "[T]he court may approve the petition terminating the parental rights . . . if it finds, upon clear and convincing evidence that the termination is in the best interest of the child and that, with respect . . . to any nonconsenting parent, over an extended period of time which . . . shall not be less than one year . . . (3) there is no ongoing parent child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent child relationship would be detrimental to the best interests of the child."

[2] In the same memorandum of decision, the trial court granted the petition terminating the respondent's parental rights and denied the respondent's concurrent motion to open and to restore guardianship to her. The respondent has not appealed from the denial of her motion for restoration of guardianship.

[3] The petitioner Mrs. L was the sister of the child's deceased father; the petitioner Mr. L is her husband. Legal guardianship was transferred to Mr. and Mrs. L jointly.

suant to § 45-61f (f) (3), the petitioners alleged that there was "no ongoing parent child relationship" between the respondent and the child, and that "to allow further time for the establishment or reestablishment of the parent child relationship would be detrimental to the best interests of the child."

In considering the grounds for termination of the respondent's parental rights, the trial court reviewed the respondent's history and found the following facts, which are not in dispute: The respondent, who was thirty-seven years old at the time of the termination hearing, has a history of substance abuse, including addiction to heroin, use of cocaine, and abuse of other drugs, dating back to the age of sixteen. Although she appeared to have achieved sobriety and to have maintained it for a number of years, she again began to abuse drugs shortly after her husband was killed in an accident in 1984, when the child who is the subject of these proceedings was seven months old.

The department of children and youth services (DCYS) began to receive referrals in 1985 concerning the respondent's drug use and inability to provide responsible care for her daughter. Late in 1986, on the basis of the respondent's admissions, the Superior Court for Juvenile Matters adjudged the child to be neglected, committed her to the custody of DCYS, and simultaneously approved the respondent's parents, the child's maternal grandparents, as the child's intended foster home. Between October, 1986, and February, 1988, the respondent lived with her parents and provided some care for her child.

By the end of 1987, the respondent had not succeeded in controlling her drug addiction, and her mother, who was by that time terminally ill, could no longer provide foster care for the child. At that time, the petitioners

in this action informed DCYS that they were willing to assume legal guardianship of the child. The respondent consented to this transfer of guardianship with the understanding that she would be able to petition the court to regain custody if she could succeed in rehabilitating herself.

The trial court found that in the time between the transfer of guardianship in February, 1988, and the termination hearing in January, 1990, the respondent had achieved a substantial degree of rehabilitation. She had reportedly remained drug-free since September, 1988.[4] She had also secured and maintained a job, and, with financial assistance from her father, had purchased a condominium and a car. She had consistently planned for reunification with her child during the period of the petitioners' guardianship, and had visited the child and talked with her on the telephone as frequently as the court and the legal guardians would permit. The court also found that the child recognized the respondent as her "real mother," enjoyed her mother's visits and displayed affection for her.

The trial court nevertheless concluded that there was "no ongoing parent child relationship" between the respondent and her daughter as such a relationship is defined in § 45-61f (f) (3), essentially because the respondent had not provided day-to-day care for her daughter for more than a year. Observing that the statute's definition of a parent-child relationship as "the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the

---

[4] The respondent's own testimony, which was uncontradicted, was that she entered a drug rehabilitation program shortly after the hearing on the transfer of guardianship, that she had stopped using drugs at that time, that she suffered a brief relapse in August, 1988, for which she sought immediate treatment, and that she has been drug-free since September, 1988.

child" corresponds to the concept of "psychological parenthood" developed by Joseph Goldstein, Anna Freud and Albert Solnit in Beyond the Best Interests of the Child (1973), the trial court concluded that the statute authorizes the court to terminate parental rights, regardless of fault, if it finds that the biological parent is not the "psychological parent" of the child and that other statutory criteria are satisfied.

The respondent's appeal urges us to overturn the trial court's judgment on two grounds. First, the respondent argues that the trial court misconstrued the standard for termination of parental rights contained in § 45-61f (f) (3). Second, she contends that the facts found by the trial court are insufficient to sustain termination of her parental rights if the proper legal standard is applied. We agree with both of the respondent's claims and accordingly reverse the judgment terminating her parental rights.

I

To put the respondent's claims in perspective, we note at the outset that the termination of parental rights is defined, in General Statutes § 45-61b (g), as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . ." It is, accordingly, "a most serious and sensitive judicial action." *Anonymous* v. *Norton,* 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that "undeniably warrants deference and, absent a powerful countervailing interest, protection." *Stanley* v.

*Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); see also *In re Juvenile Appeal (83-CD),* 189 Conn. 276, 295, 455 A.2d 1313 (1983) (noting that "it is both a fundamental right and the policy of this state to maintain the integrity of the family"). Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." *Santosky* v. *Kramer,* 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

Accordingly, § 45-61f (f) sets out three carefully limited situations in which "countervailing interests" are sufficiently powerful to justify the "irretrievable destruction" of family ties that the nonconsensual termination of parental rights accomplishes. See *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 671, 420 A.2d 875 (1979). In order to secure termination of the respondent's parental rights pursuant to § 45-61f (f), the petitioners must allege and prove, by clear and convincing evidence, that at least one of its enumerated grounds has been satisfied.

As a matter of statutory fiat, consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination. *In re Barbara J.,* 215 Conn. 31, 45, 574 A.2d 203 (1990); *In re Luis C.,* 210 Conn. 157, 165, 554 A.2d 722 (1989); *In re Juvenile Appeal (Anonymous),* supra, 177 Conn. 671–72; see also O. Ketcham & R. Babcock, "Statutory Standards for the Involuntary Termination of Parental Rights," 29 Rutgers L.

Rev. 530, 539 (1976). We have observed, however, that "[i]nsistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption proceedings can occur is not inconsistent with concern for the best interests of the child." *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 672. A child, no less than a parent, has a powerful interest in the preservation of the parent-child relationship.[5] *Santosky* v. *Kramer*, supra, 760.

Similarly, questions concerning the ultimate custodial placement of the child may not be intermingled with the issues of termination. *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 673. "Although petitions for termination are presumably seldom brought unless prospective adoptive parents are available, there still must be a two-step process to determine . . . whether cause for termination . . . has been proved" before the availability of a proper adoptive home can be con-

---

[5] Indeed, General Statutes § 45-61f (f) expressly requires the court to find, in addition to the existence of an enumerated ground for termination, that such termination is in the best interests of the child. This statutory element was added to § 45-61f (f) by Public Acts 1983, No. 83-478, § 2. Both its plain language and its available legislative history indicate that the legislature intended this provision to serve as an additional, not an alternative, requirement for the termination of parental rights. See 26 S. Proc., Pt. 12, 1983 Sess., p. 4146, remarks of Senator Howard T. Owens, Jr.; 26 H.R. Proc., Pt. 17, 1983 Sess., p. 6114, remarks of Representative Alfred J. Onorato. The legislature could reasonably have determined that in some circumstances it would be contrary to a child's best interest to sever his ties to a parent even though statutory cause to do so could be found. If, for instance, no prospective adoptive home were available, and a child was likely to be subjected to a number of short-term foster placements, a court might determine that maintaining a relationship even to a noncustodial and inadequate parent was preferable, for a given child, to having no parent at all. Recent studies of children in long-term foster care have provided evidence that suggests that "continued contact with the natural parent generally promotes the child's sense of well-being and emotional security" even for "children who were separated from their parents at a very early age and whose subsequent contacts with their parents are sporadic." M. Garrison, "Why Terminate Parental Rights?" 35 Stan. L. Rev. 423, 461 (1983).

sidered. Id. The availability of such a placement is not, in itself, a ground for the termination of parental rights. "[A] parent cannot be displaced because 'someone else could do a "better job" of raising the child . . . .' " *Corey L.* v. *Martin L.,* 45 N.Y.2d 383, 391, 380 N.E.2d 266, 408 N.Y.S.2d 439 (1978); see comment, "The 'Two-Pronged' Inquiry—The Best Alternative for the Conflicting Rights Involved in Proceedings for Termination of Parental Rights," 13 Conn. L. Rev. 709 (1981).

## A

The sole statutory ground invoked by the petitioners in this action is subdivision (3) of § 45-61f (f). This subdivision provides that the court may approve a petition for termination if it finds that "there is no ongoing parent child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent child relationship would be detrimental to the best interests of the child."

The respondent argues that the trial court's construction of this provision fails to consider prior judicial interpretations of identical statutory language and, in so doing, places a potentially insurmountable burden on all noncustodial parents. She argues that the trial court's literal interpretation of the statute as requiring the provision of daily care and guidance in order to maintain an "ongoing parent child relationship" places noncustodial parents, including parents who are granted only limited visitation rights following a divorce, at risk of losing their remaining parental rights simply through the passage of time regardless of fault. We agree.

The statute's definition of an "ongoing parent child relationship" as "the relationship that ordinarily de-

velops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child" is inherently ambiguous when applied to noncustodial parents who must maintain their relationships with their children through visitation. When this court first had occasion to construe the statutory language at issue here,[6] we resolved this ambiguity by holding that "[i]t is reasonable to read the language of 'no ongoing parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced. In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." *In re Juvenile Appeal (Anonymous),* supra, 177 Conn. 670. In that case, the mother had been separated from her child for a period of twenty-one months through a series of unfortunate circumstances that had begun when the mother was hospitalized with a serious illness. Although the child had been in foster care since the age of three and one-half years, and although the foster family wished to adopt her, we concluded that the statutory ground of "no ongoing parent-child relationship" had not been satisfied because the evidence demonstrated that the child clearly recognized her natural mother, who had been her primary caretaker

---

[6] Our prior cases construing this statutory language dealt with General Statutes § 17-43a (a) rather than with General Statutes § 45-61f (f). See *In re Juvenile Appeal (Anonymous),* 181 Conn. 638, 436 A.2d 290 (1980); *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 420 A.2d 875 (1979). With regard to the language at issue in this case, defining "no ongoing parent child relationship," these statutory sections are identical. Each was enacted by Public Acts 1974, No. 74-164, and nothing in the legislative history suggests that they should be construed differently. Our prior decisions interpreting this statutory ground for termination are therefore directly applicable to this appeal.

until the time of her hospitalization, and that the child usually enjoyed the visits with her mother that had been permitted since their separation. Id., 674–76.

Without changing our view of the proper interpretation of this language, we subsequently upheld a termination of parental rights on the ground of "no ongoing parent-child relationship." *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 645, 436 A.2d 290 (1980). As a factual matter, the evidence in that case established that the child, who was three and one-half years old at the time of the termination hearing and who had been separated from his mother since the age of eight months, did not appear to recognize his natural mother when she visited, did not respond to her overtures, appeared to avoid her, and identified only his foster parents as his father and mother. Such evidence, we concluded, justified the trial court's determination that no parent-child bond existed, despite the fact that the mother had maintained contact with her son through visitation. Id.

The Appellate Court, applying the statutory standard of "no ongoing parent-child relationship" in the light of our decisions, has correctly concluded that the statute requires that a child have some " 'present memories or feelings for the natural parent' " that are positive in nature. *In re Juvenile Appeal (84-6)*, 2 Conn. App. 705, 709, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985).[7] Although we determined, in *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 674, that evidence of a troubled parent-child

[7] The Appellate Court applied this standard to uphold termination where the evidence indicated that the children involved possessed only extremely negative "present memories or feelings" regarding their father, who had murdered their mother and older sister and who had frequently beaten all of the children prior to the murders. *In re Juvenile Appeal (84-6)*, 2 Conn. App. 705, 710–11, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985).

relationship was, without more, insufficient to justify termination on the basis of "no ongoing parent-child relationship," we agree with the Appellate Court that the standard contemplates a relationship that has some positive attributes. It is not unlikely that most parent-child relationships in which state intervention is required, including custody disputes incidental to divorce, will exhibit signs of strain. While evidence of a child's ambivalent feelings toward a noncustodial parent would not alone justify a finding that "no ongoing parent-child relationship" exists, it is nevertheless reasonable to construe this statutory ground for termination to require a finding that no positive emotional aspects of the relationship survive.

B

Our interpretation of § 45-61f (f) (3) accords with the public policy of this state "to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care . . . ." General Statutes § 17-38a (a). When a child is committed to the custody of the state, the state has a duty to provide supportive services to the parents to enhance the possibility of eventual reunification of the family. See General Statutes §§ 17-38a (a), 17-43a (d). Although we recognize that no such statutory duty exists when, as here, legal guardianship of the child is vested in a private party, the public policy concern for protection of familial integrity is nevertheless the same. If a court were authorized to find that day-to-day absence alone proved that "no ongoing parent child relationship" existed, a parent whose child needed a temporary placement[8] would otherwise have to consider the risk

---

[8] The need for such a placement might arise from such circumstances as a parent's prolonged illness, a serious injury requiring extended rehabilitation, or the call of a single parent to active military duty.

that his or her parental rights might be terminated if the guardian subsequently wished to adopt. Such a standard for termination would create an incentive for a parent to yield temporary custody to a stranger rather than to an interested relative who might develop a strong bond with the child. Creating a disincentive for a parent to choose the guardian most likely to love and protect the child while the parent was unable to provide daily care would contravene the state's interests in protecting both family integrity and the best interests of the child.

Subsequent legislative activity regarding the lack of an "ongoing parent child relationship" as a ground for termination confirms that our interpretation of this standard accurately reflects the will of the legislature. Our 1979 decision in *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 675, expressly rejected the trial court's determination that "no ongoing parent-child relationship" meant " 'no *meaningful* relationship.' " (Emphasis in original.) Id. In 1983, the Connecticut legislature considered an amendment, contained in House Bill No. 7130,[9] that would have effectively overruled our holding in that case by substituting the phrase "meaningful relationship between parent and child" for "ongoing parent-child relationship," by minimizing the role of the child's memories and feelings for the natural parent, and by minimizing the significance of parental contact through visitation. After public hearings in which at least one advocate referred to this court's decision and urged the legislature to reconsider the proposed change in the law because it would under-

---

[9] House Bill No. 7130 was eventually enacted, in amended form, as Public Acts 1983, No. 83-478. The stated purpose of the bill, as identified in the judiciary committee report retained in the legislative bill file in the Connecticut state library, was to standardize the criteria applied for termination of parental rights by the Probate and Superior courts.

mine the ability of parents to present evidence to prevent the termination of their parental rights,[10] the proposed bill was subsequently amended to reinstate the original language of the statute regarding the ground permitting termination on the basis of "no ongoing parent-child relationship." See 26 S. Proc., Pt. 12, 1983 Sess., pp. 4145–47; 26 H.R. Proc., Pt. 24, 1983 Sess., pp. 8671–75. The relevant statutory language defining "no ongoing parent child relationship" has not been amended since 1983. Because the legislature was aware of our decision and chose not to amend the language we had construed, we conclude that the legislature has effectively signalled its agreement with our interpretation. *Ralston Purina Co.* v. *Board of Tax Review,* 203 Conn. 425, 439, 525 A.2d 91 (1987); see also 2A J. Sutherland, Statutory Construction (4th Ed. Sands 1984) § 45.10.

## II

The respondent's second claim is that the subordinate facts found by the trial court would not support a termination of her parental rights on the basis of "no ongoing parent child relationship" if the trial court had applied that standard as this court has interpreted it. We agree.

As a preliminary matter, we note that it was undisputed that the petitioners had restricted the respondent's ability to visit her daughter throughout

---

[10] Conn. Joint Standing Committee Hearings, Judiciary, Pt. 3, 1983 Sess., pp. 1162–65, remarks of Raphael Podolsky. Although we ordinarily restrict our review of a statute's legislative history to the discussions conducted on the floor of the House of Representatives or of the Senate, we have occasionally included in our considerations evidence of testimony of individuals addressing the proposed enactment in committee hearings when, as here, such testimony provides particular illumination for subsequent legislative actions on proposed bills. See *In re Sheldon G.,* 216 Conn. 563, 570 n.6, 583 A.2d 112 (1990); *Mahoney* v. *Lensink,* 213 Conn. 548, 559 n.15, 569 A.2d 518 (1990).

the entire period of their guardianship. The petitioners had permitted the respondent to visit the child, only on a supervised basis, on an average of four hours every other week, and had permitted the respondent to talk to the child on the telephone three times a week. The respondent had agreed with this schedule of visitation at the time of transfer of guardianship, when she was still actively abusing drugs, but after months of sobriety she had sought, without success, increased and unsupervised visitation.[11] The evidence regarding the nature of the respondent's relationship with her child at the time of the termination hearing must be reviewed in the light of the circumstances under which visitation had been permitted. *In re Luke G.*, 40 Conn. Sup. 316, 324–25, 498 A.2d 1054 (1985).

The principal evidence relied upon by the court in support of termination was the opinion of David Mantell, a psychologist appointed to conduct an evaluation of the child's relationships with the respondent and with the petitioners. In his report to the court, Mantell indicated that the child's "primary psychological bond [is] with her aunt and uncle who are her psychological parents and her parents of preference." Mantell characterized the child's relationship with the respondent as "a visiting relationship which appears to be an affectionate one and one of mutual interest." He observed, however, that the child would suffer a loss if she were never allowed to see her biological mother again,

---

[11] The court record reveals that the respondent filed at least three motions seeking visitation rights. Two of these, filed April 28, 1989, and June 23, 1989, were not ruled upon until the order terminating the respondent's parental rights issued on March 20, 1990. A third was filed on October 29, 1989, during the pendency of the termination proceedings, when the petitioners, on advice of counsel, suspended all of the respondent's visitation rights. The court granted that motion, restoring the previous biweekly visitation schedule and ordering one additional holiday visit, on December 18, 1989.

although in his opinion that loss would be far less severe than the loss of her present home with the petitioners.

A substantial portion of the expert testimony at the termination hearing focused on the child's positive relationship with the petitioners and the possible psychological harm she might suffer if she were to be separated from them. Such testimony, although highly relevant to the child's custodial placement, does not support the legal conclusion that no parent-child bond existed between the respondent and the child. "The fact that the child may have established a loving relationship with someone besides her mother does not prove the absence of a mother-daughter relationship. It is insufficient to prove that the child has developed emotional ties with another person. Certainly children from two-parent homes may have two 'psychological parents'; even children whose parents are divorced may retain close emotional ties to both, although the relationship to one is maintained solely through visitation." *In re Juvenile Appeal (Anonymous),* supra, 177 Conn. 675. Under the two-pronged inquiry required by § 45-61f (f) (3), evidence regarding the availability of a suitable adoptive home is relevant only *after* the court has determined that no ongoing parent-child relationship exists. Id., 673–74.

The subordinate facts found by the trial court indicate that the respondent has consistently visited the child throughout the petitioners' guardianship and has consistently planned for reunification. The court's findings also indicate that the child recognizes the respondent as her mother, that she would suffer some sense of loss if not permitted to visit with her, and that the relationship between the child and her mother is "an affectionate one and one of mutual interest." The legal conclusion to be drawn from these facts is that the child has "present memories or feelings" for her mother,

that at least some aspects of these memories and feelings are positive, and that an ongoing parent-child relationship thus exists. *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 670; *In re Juvenile Appeal (84-6)*, supra, 709. The petitioners therefore have not met their burden of proving, by clear and convincing evidence, that the statutory ground for termination under § 45-61f (f) (3) has been satisfied. See *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 295, 455 A.2d 1313 (1983) ("[w]here a fundamental right is involved, the burden of proof is always on the party seeking to interfere with that right").

## III

It is important to note, in conclusion, what we have not decided in this appeal. Although we are reversing the trial court's termination of the respondent's parental rights, its decision regarding the child's present guardianship stands.[12] The respondent retains the right to visit the child and the right to seek restoration of guardianship. Although a "best interests of the child" analysis is irrelevant in determining whether an "ongoing parent-child relationship" exists, it is relevant, and perhaps dispositive, in matters of visitation; see General Statutes §§ 45-44e and 46b-59; and in any proceeding to transfer guardianship. See *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 657–68 (holding that the trial court did not err in denying a restoration of custody to the mother, although the original cause for commitment no longer existed, because the state had met its burden of proving that a transfer of custody at that time would be detrimental to the interests of the child). The unanimous opinion of the experts at the termination hearing in this case was that any attempt at that time to remove the child from her home with

---

[12] See footnote 2, supra.

the petitioners would be extremely detrimental to her psychological health. We would not hazard to predict whether such opinions will change in the future. Many factors could affect such a determination, including the respondent's continued sobriety and stability, the continuing willingness and ability of the petitioners to provide a suitable home, and the stated preferences of the child herself.

That portion of the judgment terminating the respondent's parental rights is reversed and the case is remanded with direction to render judgment denying the petition.

In this opinion the other justices concurred.