[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. INTRODUCTION
On February 15, 1991, the Commissioner of the Department of Children and Youth Services ("DCYS") filed a Petition For Termination of Parental Rights seeking to terminate the rights of Carrie Smith and Bruce Hickson in their son, Kwane Hickson. Jurisdiction is conferred by Conn. Gen. Stat. Sec. 17a-112 (a) (1991),[1] the child having previously been committed to DCYS pursuant to Sec. 46b-129.[2] The Petition alleges the existence for not less than one year of the grounds for the nonconsensual termination of parental rights set forth in Sec. 17a-112 (b)(1), (2) (4): abandonment, failure to achieve personal rehabilitation, and no ongoing parent-child relationship. Both parents have appeared and, separately represented by able counsel, have contested the case against them. For the reasons set forth below, the court concludes that the parental rights of both parents should be terminated. All findings have been proved by clear and convincing evidence. See Santosky v. Kramer, 455 U.S. 745
(1982); Sec. 17a-112 (b); Practice Book Sec. 1049.
II. STRUCTURE
Before proceeding to the merits of the case, its structure must be briefly described. Although there was a unified hearing in this case, on July 29, 1991, there are two phases to the CT Page 6824 Court's consideration of each parent's case. In the adjudicatory phase, the court determines the validity of the specific grounds alleged in the Petition and consequently is limited to events preceding the filing date of February 15, 1991. If one or more of the adjudicatory grounds is proven by clear and convincing evidence, the Court is obliged to proceed to the dispositive phase. This latter phase is concerned with what action should be taken in the best interest of the child, and, as to that phase, the Court may consider matters occurring up to the date of the trial. See In re Shannon S., 41 Conn. Sup. 145, 146,562 A.2d 74, aff'd, 14 Conn. App. 20, 560 A.2d 993 (1989). The six factors listed in Sec. 17a-112 (d) must be expressly considered in the dispositional phase. In re Barbara J., 215 Conn. 31, 47,574 A.2d 203 (1990).
III. ADJUDICATION
A. THE MOTHER
Although the cases of the father and mother must be considered separately, there was, as mentioned, a unified hearing. In deciding this case, the Court has heard and considered the testimony of Adriana Holmgren, a medical social worker at St. Mary's Hospital in Waterbury; Marcia Weaver, the DCYS treatment worker assigned to this case; Ralph S. Welsh, a clinical psychologist who evaluated Kwane and both parents in September, 1990; and both parents. The Court has also read and considered a number of documentary exhibits, viz. the medical records concerning Kwane's birth (Ex. A B); a November 6, 1989 service agreement between DCYS and the parents (Ex. C); a DCYS Social Study dated February 15, 1991 (Ex. D); Kwane's birth certificate (Ex. E); the parents' respective conviction records (Ex. F G); Dr. Welsh's parent-child interaction studies concerning the respective parents (Ex. H I); and Dr. Welsh's psychological evaluations of the respective parents (Ex. J K). The Court also takes judicial notice of the procedural history of this case established by the documents in its file. Because the parents, although unmarried, have a long-term relationship (they have lived together, on and off, for approximately ten years) and because their relationships (or lack thereof) with Kwane share many common characteristics, much of the evidence submitted pertains to both parents. Nevertheless, the parents' cases must legally be considered separately, and the mother's will be considered first.
Ms. Smith was born on April 20, 1959. She dropped out of school in the eleventh grade and has no work history. She has had four children. Her rights to one child have been terminated, one child has been placed with relatives under DCYS custody, and a third died in infancy. Kwane is the fourth. She is now pregnant with her fifth. She has a staggering criminal record (mostly for CT Page 6825 prostitution, larceny, and failure to appear) dating from 1979 and has spent a good deal of her adult life in prison. She was, in fact, released from her most recent sentence (for violation of probation) just a few days before the hearing. She has a consistently poor track record in working with DCYS.
When Kwane was born to Ms. Smith on September 23, 1989, both he and his mother tested positive for cocaine. Because of his medical condition, an order of temporary custody was granted by the Court on September 29, 1989. Both parents visited Kwane three times in October, 1989. On November 6, 1989, DCYS entered into a written service agreement with both parents. (Ex. C.) In this agreement, the parents undertook to work with DCYS, inform DCYS of their address and phone number at all times, to visit with their son "two/three times monthly," to obtain a secure financial situation, to undergo drug evaluations, to maintain weekly contact with DCYS, to obtain a suitable apartment, to work with a parent aide, to submit to parent/child evaluations, and to apply for Section 8 housing. By the end of November, however, a pattern of conduct began which has endured, with some variations, until the present day. Neither parent appeared for an in-court review on November 28 or for a scheduled visit on November 29. DCYS attempted to locate the parents through letters and home visits in December but was unable to do so.
On February 9, 1990, Ms. Smith telephoned DCYS saying that she wanted to see her son. A visit was scheduled for February 14, but she did not appear. Ms. Smith next telephoned DCYS on April 19. On April 20, both parents visited the DCYS office saying that they had been having marital and drug problems. Court hearings on a neglect petition were held on April 24 and April 30, 1990, with both parents present. Ms. Smith testified that she intended to visit Kwane frequently. On April 30, 1990, the Court adjudicated Kwane neglected and committed him to the custody of DCYS for eighteen months. On May 22, 1990, the Court set expectations requiring the parents to keep DCYS aware at all times of their current address and telephone number, to keep all appointments with DCYS, to visit with Kwane at least twice a month, to participate in parenting classes, to obtain stable incomes, to apply for Section 8 housing, to attend court-ordered drug evaluations, to maintain weekly conduct with DCYS, to work with a parent aide, and to attend court-ordered psychological evaluations and parent/child evaluations. (Court's Ex. 2.) Both parents appeared for a visit on May 31. After that, their familiar pattern of neglect recurred, and they broke appointment after appointment.
In July 1990, DCYS discovered that Ms. Smith was in Niantic Correction Institution. She was released on September 11, and on September 27, both parents attended the court-ordered parent-child CT Page 6826 and psychological evaluations before Dr. Welsh in Bridgeport. This was the first time that either had seen Kwane since May 31. Ms. Smith was quite supportive of Kwane during the visit but it was difficult to tell whether the child (then age one year) recognized her as a parent. On this occasion, the parents gave Kwane a stuffed reindeer. This is the only gift that Kwane has ever received from either parent in his entire life. (No written greetings have ever been sent by either parent although, of course, Kwane cannot yet read.)
The September 27, 1990, evaluation was the last time that Kwane ever saw his father. He saw his mother once more, on November 15, 1990, when DCYS arranged for a visit at Niantic. Ms. Smith was released from Niantic on December 6, but (like the father) did not appear for either a court hearing on December 18 or an administrative review on December 27.
On January 3, 1991, Ms. Smith called DCYS requesting a visit, but failed to appear for a visit scheduled on January 24. She similarly failed to appear at a plea hearing on the termination petition on March 12. On April 26, she was again incarcerated. During her incarceration, she was transported to a number of hearings in this court. She was released, on supervised home release, on July 18. Although she and the father had ample notice of the termination hearing held on July 29, 1991, neither parent appeared at the hearing until 2:14 P.M., after much of the hearing (scheduled to begin at 10:00 a.m.) had transpired. Neither offered any explanation for their belated arrival.
It is most unlikely that Kwane would have even recognized either parent on February 15, 1991. Certainly he has never had any real conception of either parent as a person with any role in his life. He is at this point extremely bonded to his foster mother with whom he has been placed for one and a half years and who would like to adopt him.
As mentioned above, DCYS alleges the existence of three distinct nonconsensual adjudicatory grounds. The Court finds that one of those grounds — no ongoing parent-child relationship — has been proven not just by clear and convincing evidence but by overwhelming evidence. Because of this conclusion, detailed below, it is unnecessary to consider the other grounds advanced by DCYS.
Sec. 171-112(b)(4) provides that the Court may grant a termination petition if it finds, upon clear and convincing evidence that for not less than one year,
 There is no ongoing parent-child relationship, which means the relationship that ordinarily develops as CT Page 6827 a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
Under this statutory provision, the Court's inquiry in this case falls into two parts: first, whether on February 15, 1991, there had been no ongoing parent-child relationship for at least a year; and second, whether further time should be allowed for such a relationship to be established or reestablished.
(1) The Connecticut Supreme Court has long held that,
 It is reasonable to read the language of "no ongoing parent-child relationship" to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them or has definitively lost that relationship, so that despite its former existence it has now been completely displaced. In either case the ultimate question is whether the child has no present memories or feelings for the natural parent.
In re Juvenile Appeal (Anonymous), 177 Conn. 648, 570,420 A.2d 875 (1979). More recently, the Supreme Court has approved an analysis, originally adopted by the Appellate Court, that "the statute requires that a child have some "'present memories or feelings for the natural parent"' that are positive in nature." In re Jessica M., 217 Conn. 459, 469 (1991). In this case, it is overwhelmingly clear from the evidence that Kwane has never known either of his parents, that no relationship has ever developed between them, and that Kwane has never had any memories of or feelings for either parent. His parents have simply never been part of his life. It is important, here, to bear in mind a significant difference between children and adults:
 Unlike adults, children have no psychological conception of relationship by blood-tie until quite late in their development. For the biological parents, the facts of having engendered, CT Page 6828 borne, or given birth to a child produce an understandable sense of preparedness for proprietorship and possessiveness. These considerations carry no weight with children who are emotionally unaware of the events leading to their births. What registers in their minds are the day-to-day interchanges with the adults who take care of them and who, on the strength of these, become the parent figures to whom they are attached.
J. Goldstein, A. Freund A. Solnit, Beyond The Best Interests of the Child 12-13 (2d ed. 1979). These observations hold true in this case. The evidence presented to this court establishes that there was on February 15, 1991, no parent-child relationship within the meaning of the statute.
(2) Given the facts of this case, the Court concludes that to allow further time for the establishment of a parent-child relationship would be detrimental to the best interests of the child. Dr. Welsh credibly testified that to allow the very substantial further time that would be necessary for a parent-child relationship to be established would not be in Kwane's best interests. The Court agrees. Indeed it is not clear whether such a relationship could ever be established, even in the indefinite future.
Ms. Smith, to consider her case alone for the moment, professes to love her son and to have the best of intentions of visiting him, but her sad history gives the Court no reasonable basis to believe that her professed interest will ever be translated into concrete action. The very fact that she arrived over four hours late for the termination hearing, without explanation, indicates either that her interest in her son is purely theoretical or that she is hopelessly unable to organize her life to take the most basic steps to establish a relationship. In either event, Kwane will surely suffer. Of course, in the distant future, anything is possible, "but it is not in the future but in the present that the decision about his future has finally to be made." In re K.D., [1988] 1 A.C. 806, 829 (H.L. 1988). By the time that several more years have passed, it will simply be too late. "It is in the next two years in this little boy's life . . .when his character will be formed as a result of the emotional relationships which he successfully forms with his foster parents . . .and you cannot dig up children in the way that you dig up geraniums: they form emotional roots and those roots have to be preserved intact." Id. at 829-30. Under these circumstances, the allowance of further time for a relationship to be established would be detrimental to Kwane's best interests. CT Page 6829
B. The Father
From the child's perspective, the father's situation is virtually identical to the mother's. There is no parent-child relationship, there has never been one, and, even if this Court were to deny the petition, the chances of any relationship being established in the future are distressingly meager. It is, however, appropriate to describe the distinctive characteristics of Mr. Hickson's case.
In terms of visitation, the father's record is slightly worse than the mother's. Ms. Smith has seen Kwane a few more times than has Mr. Hickson (the Court emphasizes that very small numbers are being compared here), and Mr. Hickson has not seen Kwane at all since the court-ordered evaluation on September 27, 1990. It is highly doubtful that Kwane would even have recognized his father on February 15, 1991.
Mr. Hickson's history and present state must also be described. He was born on January 15, 1940. He has completed high school and, according to his account, two years of community college. He apparently has artistic talent, and testified that he makes his living by art. In many respects, however, he has a history distressingly similar to that of Ms. Smith. He has six children in addition to Kwane, none of whom live with him. At least three of his children (in addition to Kwane) have been in DCYS custody or foster care. Like Ms. Smith, he has a long history of not following through with verbal commitments that he has made to work with DCYS for the return of his children. Like Ms. Smith, he also has a history of drug abuse, although he claims to have been clean in recent years. (Neither parent has, however, submitted to court-ordered drug tests.)
The Court is constrained to add that Mr. Hickson's mental state is also a subject of grave concern. Testifying in this case, he claimed that he is subject to a voodoo curse which prevents him from seeing Kwane and repeatedly described demons laughing at and attacking him. He has not made this claim at any previous point in this case. It is clear in light of this present belief (which seems to be sincere) that a great deal of therapy (and, according to Mr. Hickson, an exorcism) would be necessary before he could visit Kwane again. Under any theory of the case, this would involve a rather substantial passage of time.
As already described, there was, on February 15, 1991, no parent-child relationship within the meaning of the statute. Given the facts of the case, the Court concludes, for reasons already discussed, that to allow further time for the establishment of a parent-child relationship would be detrimental CT Page 6830 to the best interests of the child. Mr. Hickson, like Ms. Smith, professes to love Kwane, but, as in her case, his sad history gives the Court no reasonable basis to believe that his professed interest will ever be translated into concrete action. A decision about Kwane's future must be made on the facts in the record now, and those facts establish that the allowance of further time for a relationship to develop would be detrimental to Kwane's best interests.
IV. DISPOSITION
A. The Mother
With respect to the specific considerations for the termination of parental rights listed in Section 17a-112(d), the court finds as follows:
(1) DCYS has offered Ms. Smith a variety of services to facilitate her reunion with Kwane, from shortly after Kwane's birth until at least the filing of the February 15, 1991, petition. The service agreement of November 6, 1989, has already been described. DCYS has made almost heroic attempts to facilitate visitation, almost all of which have been ignored.
(2) Expectations were set by the court on May 22, 1990. Ms. Smith, who was supposed to visit Kwane a minimum of twice a month, has visited him a total of three times since then. She cooperated with court-ordered psychological and parent-child evaluations, but has not fulfilled her numerous other obligations under the order.
(3) The child has no feelings or emotional ties with respect to either parent and is wholly bonded to his foster mother.
(4) The child was born on September 23, 1989, and was thus 22 months old at the time of trial.
(5) Ms. Smith has made only extremely minimal efforts to adjust her circumstances, conduct, or conditions to make it in the best interests of the child to return him to his home in the forseeable future. (A) She has, as already described, seen him only three times since May 22, 1990, and has maintained no other contact (such as telephone calls, letters, or gifts) with him. (B) She has had only sporadic contact with DCYS and none with the foster mother.
(6) Ms. Smith has not been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of Mr. Hickson or the unreasonable act of any other person or by her economic circumstances. CT Page 6831
In addition to these factors, the Court has also considered the expert testimony of the examining psychologist who testified in this case, Dr. Welsh, and the position of Kwane's attorney — both of whom believe that termination is appropriate. Of course, the ultimate decision as to the child's best interest must be made by the Court upon a full consideration of all of the evidence. After such a consideration, and on the basis of clear and convincing evidence, the Court concludes that a termination of parental rights is mandated by the best interest standard in this case. As DCYS succinctly put it during final argument, the parents have had their chance, and now it is Kwane's chance. A termination of parental rights will provide the stability for Kwane that he, like any child, needs.
B. The Father
The father's statutory termination factors here are virtually identical to those of the mothers.
(1) DCYS's offers of services and its service agreement with respect to the father are the same as those with respect to the mother.
(2) The expectations set by the court on May 22, 1990, have already been described. The father has visited Kwane twice since those expectations were set. In other respects, his performance is identical to MS. Smith's.
(3)-(4) These factors are described in the portion of the opinion dealing with the mother.
(5) As is the case with the mother, Mr. Hickson has made only the most minimal of efforts to adjust his circumstances, conduct, or conditions to make it in the best interests of the child to return him to his home in the forseeable future. (A) He has seen Kwane only twice since May 22, 1990, and has maintained no other contact with him. (B) He has had only sporadic contact with DCYS and none with the foster mother.
(6) Mr. Hickson has not been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of Ms. Smith or the unreasonable act of any other person or by his economic circumstances.
For the reasons already set forth in the portion of the opinion dealing with the mother, the Court concludes that a termination of parental rights is mandated by the best interest standard and by clear and convincing evidence, in this case.
V. CONCLUSION CT Page 6832
For the foregoing reasons, a termination of the parental rights of Carrie Smith and Bruce Hickson in their minor child, Kwane Hickson, is ordered.
Pursuant to Sec. 17a-112 (f), it is further ordered that the Commissioner of DCYS be appointed statutory parent so that Kwane can be placed in adoption. Pursuant to Sec. 17a-112 (i), the statutory parent shall report to the court within ninety days on a case plan for the child. It shall then submit reports every six months thereafter until such time as any proposed adoption plan has become final.
JON C. BLUE Judge of the Superior Court