[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is the matter of Carlia G. Carlia was born on July 25, 1981. Her father is Carlton E. and her mother is Cheryl G. CT Page 3801
By petition filed on August 9, 1990 the Commissioner of the Department of Children and Youth Services ("the Commissioner" and "DCYS") sought the termination of the parental rights of Carlia's parents. On December 16, 1991 the parties agreed to bifurcate the proceedings and petitioner proceeded against Carlia's father only.
A hearing on the petition as it relates to father opened on December 16, 1991, continued on December 17th and was concluded on December 30, 1991.
 II.
In her petition the Commissioner alleges that the child has been found neglected in a prior proceeding and that father has failed to achieve such degree of personal rehabilitation as would encourage the relief that within a reasonable time, considering the age and needs of the child, the father could assume a responsible position in the life of the child; that the child has been denied by reason of act or acts of commission or omission by father, the care, guidance or control necessary for her physical, educational, moral or emotional well-being; that there is no ongoing parent-child relationship between Carlia and her father, which is defined as the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child; and that the above-mentioned reasons [for termination] have existed for not less than one year. At the December 16, 1991 hearing petitioner amended her petition, alleging abandonment by father.
 III.
The termination of parental rights is "a most serious and sensitive judicial action," In re: Jessica M., 217 Conn. 459 at 464, quoting from Anonymous v. Norton, 168 Conn. 421, 430,362 A.2d 532, cert. denied, 423 U.S. 935, 96 S.Ct. 294,46 L.Ed.2d 268 (1975). The interest of parents in their children is a fundamental constitutional right, In re: Jessica M., supra at 464. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. In re Jessica M., supra at 465, quoting from Santosky v. Kramer, 455 U.S. 745, 573,102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
To effectuate a non-consentual termination of parental rights a petitioner must prove first, by clear and convincing evidence, the existence of at least one of the statutory grounds for termination set forth in General Statutes 17a-1112. If a statutory CT Page 3802 ground for termination is so established, the court must proceed to make the six written findings required by General Statutes,17a-112 (d) before moving on to determine whether termination is in the best interests of the child. At this dispositional stage, petitioner must prove by clear and convincing evidence that the termination sought is in the child's best interests. "Consideration of the best interests of the child cannot vitiate the necessity of compliance with the statutory criteria for termination." In re Jessica M., supra, at 465. In re Barbara J., 215 Conn. 31,45. Nor can the court consider the availability of an appropriate adoptive home as bearing on the issue of establishing a statutory ground for termination; In re Jessica M., supra, at 486.
 IV.
At the hearing on this petition testimony was taken from Janice Currier, DCYS: Anthony Campagna Ph.D., a licensed clinical psychologist who interviewed various family members and prepared a psychological evaluation for the court; Mary F., Carlia's foster mother; Evelyn Vereen, DCYS; and Carlia's father Carlton E. From the testimony and the documents entered into evidence the court makes the following findings of fact:
Carlia lived with a series of caretakers prior to November, 1987. In the period 1984-85 she was twice placed in foster homes at mother's request. She then lived with her maternal great grandmother until the latter died in 1986. Carlia was then placed in the care of her maternal grandmother, Gloria G., until the child's removal in 1987. Since that time the child has resided with her foster mother, Mary F.
Carlia first came to the attention of the court on January 22, 1986 when a petition alleging neglect was filed on her behalf by DCYS. She was adjudicated neglected and committed to DCYS on February 19, 1986. No father was listed on the petition but at the time of disposition Keith J., father of a half-sister of Carlia, stated he was Carlia's father.
A second petition was filed on February 4, 1988 alleging that Carlia was neglected and uncared for. Subsequent to this filing, Carlia's mother stated that Carlton E. was Carlia's father. Carlton E. later acknowledged paternity and was made a party to the proceedings. On August 24, 1988 Carlia was adjudicated uncared for as to father and neglected and uncared for as to mother and again committed to the care and custody of the Commissioner. That commitment has been extended periodically to the present day.
Carlton E., Carlia's father, born in 1961, was incarcerated at the time of her birth. He was released on parole in 1990 CT Page 3803 but was again imprisoned in January, 1991. He anticipates being released sometime in mid or late 1992. Carlton is married and has
Starting in 1985 Carlia has had contact with her father. She has visited him in prison and starting in 1989 he has visited her occasionally while on weekend furloughs. While his recorded visits total no more than 6 in the 1989-91 period it appears he has seen Carlia at his mother's home more frequently. Carlton's mother, Magdaline E. has maintained a relationship with Carlia, who visits with Magdaline E. Carlia has a warm attachment to Magdaline and values this relationship. In 1988 DCYS, at Carlton's request investigated Magdaline E. and her home as a possible placement for Carlia but Magdaline's home was found to lack room. More recently Magdaline has asked to be considered as an adoptive resource. While fond of her grandmother, Carlia has steadfastly expressed her desire to remain in the care of Mary F.
 V.
Statutory Grounds For Termination
The Commissioner alleges that father has abandoned this child in the sense that he failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.
For most of this child's life, starting from before her birth, Carlton has been incarcerated. He remains incarcerated. For the first several years of her life his paternity was not established. Nonetheless, father has shown interest and concern for Carlia, albeit uneven. The petitioner has failed to prove, by clear and convincing evidence that Carlton has abandoned Carlia.
Similarly, petitioner has failed to prove that the child has been denied by reason of act or acts of omission or commission by father the care, guidance or control necessary for her physical, educational or emotional well-being. Carlton has never been this child's custodial parent. Circumstances beyond his control have made it difficult for father to exert the care, guidance and control this child needed. Meanwhile, the child has received appropriate care, guidance and control from Mary F.
The petitioner also alleges that there is no parent-child relationship between Carlia and her father, by which is meant the relationship which ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and that to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child.
Carlia's father has never met on a day to day basis her CT Page 3804 physical, emotional, moral and educational needs, so the foundation for such parent-child relationship has not been laid. Nonetheless, our Supreme Court has stated that this standard is "inherently ambiguous when applied to non-custodial parents who must maintain their relationships with their children through visitation." In re: Jessica M., 217 Conn. 459, 468. The standard to be applied to such relationship involving non-custodial parents is whether the child has some present memories or feelings for the natural parent that are positive in nature, In re: Jessica M., supra, at 469.
Carlia recognizes and readily converses with Carlton. She knows him to be her biological father. She feels a connection to him. Her social worker (Ms. Currier) testified Carlia enjoyed seeing her father at the evaluation. She is angry at, and distrustful of him for what she sees as his efforts to take her away from Mary F. Nonetheless, the court cannot find that this child is devoid of feelings toward Carlton which are positive in nature.
Accordingly, the petitioner has failed to establish, by clear and convincing evidence, that there is no parent-child relationship between Carlton and Carlia.
 VI.
Carlia was found in a prior proceeding, on August 24, 1988, to have been uncared for, as to father. The petitioner alleges father has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, he could assume a responsible position in the life of the child. The court agrees.
Carlton E. is 30 years old. He is incarcerated and has been in prison most of his adult life. He appears to have survived this experience mentally and emotionally intact and he has worked to better himself in recent years, taking education courses and participating in self-help groups. He has married and he and his wife have a daughter. He retains a "sturdy optimism" about the future. He expects to be released from prison sometime between June and November of this year. He has never held a job in the community but he has a friend who he believes will have a job for him when he is released. He estimates he will need 12-18 months preparation to assume the responsibility of — caring for Carlia. This estimate comes late in the day as prior to his testimony in December 1991, Carlton E's focus had been on suggesting his mother, Magdaline E. as an adoptive resource for Carlia.
Dr. Campagna, who interviewed and tested Carlton stated that Carlton demonstrates symptoms of a mixed personality disorder comprising anti-social behavior and impaired impulse control, which will CT Page 3805 make it difficult for Carlton to function successfully in the community once out of prison. Campagna noted he has never seen a person with impulse control problems to the degree of Carlton's who's been free of prison involvement. Campagna concluded that Carlton would need a long-term rehabilitation program, of one, two or more year's duration that would assist Carlton to restructure his life in terms of his values, education and social needs. Absent such as successful rehabilitation Campagna concluded it is unlikely father can become a contributing member of society.
Campagna found that father lacked insight regarding the nature of his personal difficulties nor showed signs of adequate appreciation of necessary rehabilitation by father within a reasonable period of time. The court finds Dr. Campagna's conclusions persuasive.
The court is required to consider the age and needs of this child. She is in her eleventh year. She has never been able to rely on this father and his attempts to establish a parenting role in her life have caused her fear, anger and distrust. Consequently, Carlton, in seeking to become part of Carlia's life, is not "starting from scratch" but would need to overcome obstacles, largely of his own making. Three incidents illustrate the problem.
In July, 1990 Carlton became involved in an altercation with Carlia's biological mother, in which the mother brandished a knife at Carlton. Since that incident Carlia has stated she doesn't feel safe being with father.
In the Spring of 1991 Carlia became highly upset following a telephone conversation with father in which she concluded he was trying to pressure her to say she wanted to live with Magdaline E. She demanded that father not be allowed to telephone her thereafter. Her anger at father has been deep and persistent.
In December, 1991 Carlia showed further anger and hostility, saying of father: "He lied to me." Apparently Carlton gave Carlia to understand he was willing to accede to her wish to stay with Mary F. and then reversed himself.
It would not meet the needs of Carlia to maintain her in a state of uncertainty for years to come in the hope that father could acquire an awareness of what would be necessary to equip himself to assume a responsible position in the life of this child.
The court finds, by clear and convincing evidence, that Carlia's father, Carlton, has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child he CT Page 3806 could assume a responsible position in the life of the child.
 VII.
Required Findings
The statutory basis for termination having been established, the court makes the following findings, all by clear and convincing evidence as mandated by General Statutes, Section 17-112 (d):
(1) DCYS arranged for regular visitation at father's place of incarceration and transported the child to and from such visits. DCYS also held treatment plan reviews at father's place of incarceration. DCYS sought to work with father to set up consistent visitation when he was released in 1990 but he was unwilling to meet with the DCYS worker to do so. DCYS investigated father's mother as a possible placement resource for Carlia, at father's request.
(2) Father participated in a court-ordered evaluation.
(3) The child recognizes her father, knows him to be her father but harbors feelings of anger, and suspicion toward him and fears visiting him.
The child has warm, affectionate regard toward father's mother. The child has strong, warm, positive attachments to her foster mother who the child calls "Mommy". The foster mother is the child's "psychological mother."
(4) The child is approximately 10 years, 8 mos. old.
(5) Father has made sporadic, disorganized efforts to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return her to his home in the foreseeable future. These efforts have been inadequate. When out of prison on furlough or on parole father failed to visit the child for long stretches of time and resisted establishing a plan of consistent visits.
Carlton had 2 or 3 scheduled visits with Carlia at his mother's house, perhaps 3 at the foster home in the period 1989-90. He testified he had seen Carlia at his mother's often and the child verified this. He had an overnight visit in July, 1990. He made sporadic phone calls until such calls were terminated at the child's request.
Father sent Carlia $80 on one occasion; $50 on another. He sent 2 birthday cards. One year ago he sent the child sneakers. This past year Carlton's wife brought Carlia $10 some 2 weeks CT Page 3807 after her birthday.
(6) There is no evidence that this father was prevented from maintaining a meaningful relationship with Carlia by the unreasonable act of conduct of the other parent on the unreasonable act of any other person on by the economic circumstances of father.
Disposition
The court concludes, by clear and convincing evidence, that it is in Carlia's best interest, that her father's parental rights be terminated.
Carlia is 10-3/4 years old. By all accounts she is well-behaved, bright and happy. She is in the fifth grade and gets As Bs on her report cards. She has lived with Ms. F. since November, 1987. Ms. F. has fulfilled the role of parent in Carlia's life and the two are deeply attached to each other. Ms. F. hopes to adopt Carlia and Carlia is pleased and excited by the prospect of being adopted by Mary F. Carlia has made known her wishes firmly and consistently over time. She wishes to continue living with Mary F. She does not wish to live with Magdaline E. She is fond of Magdaline and wants to see her but is very unwilling to consider living with her.
The child's objections to living with Magdaline are specific:
1. She feels unsafe in the neighborhood, 2. She is fearful of conditions at the neighborhood school, 3. She dislikes her grandmother's religious congregation, 4. She is bothered by what she sees as a lack of supervision between the end of school and grandmother's arrival at home, 5. She believes grandmother uses inappropriate physical discipline on Carlia's cousins.
The continued uncertainty about her status causes her increasing stress and, Dr. Campagna testified, poses very serious risks for her to "go off course", intellectually, emotionally and socially.
Carlia is aware of these court proceedings and their possible impact on her situation. She has indicated she would wish to be adopted by Mary F. even if it meant she could not see her father's family, much as she enjoys Magdaline and her cousins.
In actuality there appears to be no reason to anticipate her loss of contact with her father's family. Mary F. has stated she would not discourage such contact. Carlia will not forget her biological father. CT Page 3808
Accordingly, the parental rights of Carlton E. in and to his daughter Carlia are hereby terminated and the Commissioner of the Department of Children and Youth Services shall file the report required by General Statutes, Section 17a-112 (i) within ninety days of today's decision and every twelve months thereafter until adoption is effected.
Trial counsel for father is appointed appellate counsel should father seek to appeal this decision. If counsel declines to perfect an appeal, he should notify the clerk of court promptly and file a motion for extension of time so that another attorney may be appointed to review the record. Should this second attorney decline to perfect an appeal he or she is to notify the clerk of court promptly.
The clerk is to notify father that he is free to obtain counsel for purposes of taking appeal, which counsel my be appointed by the court.
DOWNEY, JUDGE