[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I
By petitions filed February 28, 1991 the Commissioner of the Department of Children and Youth Services ("the Commissioner" and "DCYS") seeks to terminate the parental rights of Theresa M. and Nathaniel S. in and to their children Billy Jean M., Joshua M., and Nathaniel S. Billy Jean was born on March 26, 1984; Joshua on September 23, 1986; and Nathaniel on April 30, 1989.
A hearing on these petitions opened on January 6, 1992 and continued on January 14th, when the parties rested. Trial briefs were filed by the parties on February 18, 1992.
 II
The grounds for termination alleged are identical in each petition. The Commissioner alleges that the children have been abandoned by both father and mother in the sense that the parents have failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of each child; that each child has been found in a prior proceeding to have been neglected and uncared for, and that both father and mother have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the ages and needs of the children, the parents could assume a responsible position in the lives of these children; that each child has been denied by reason of act or acts of commission or omission by the mother and father the care, guidance or control necessary to their physical, educational or emotional well-being; that there is no on-going parent-child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met a continuing, day-to-day basis the physical, emotional, CT Page 5000 moral, and educational needs of the child and that to allow further time for the establishment or the re-establishment of the parent-child relationship would be detrimental to the best interests of each child; and that the above-mentioned reasons for termination have existed for not less than one year.
 III
The termination of parental rights is "a most serious and sensitive judicial action." In re: Jessica M., 217 Conn. 459 at 464, quoting from Anonymous v. Norton, 168 Conn. 421, 430,362 A.2d 532, cert. denied, 423 U.S. 935, 96 S.Ct. 294,46 L.Ed.2d 268 (1975). The interest of parents in their children is a fundamental constitutional right, In re: Jessica M., supra at 464. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. In re Jessica M., supra at 465, quoting from Santosky v. Kramer, 455 U.S. 745, 573, 102 S.Ct. 1388,71 L.Ed.2d 599 (1982).
To effectuate a non-consentual termination of parental rights a petitioner must prove first, by clear and convincing evidence, the existence of at least one of the statutory grounds for termination set forth in General Statutes 17a-112. If a statutory ground for termination is so established, the court must proceed to make the six written findings required by General Statutes, 17a-112 (d) before moving on to determine whether termination is in the best interests of the child. At this dispositional stage, petitioner must prove by clear and convincing evidence that the termination sought is in the child's best interests. "Consideration of the best interests of the child cannot vitiate the necessity of compliance with the statutory criteria for termination." In re Jessica M., supra, at 465. In re Barbara J., 215 Conn. 31, 45. Nor can the court consider the availability of an appropriate adoptive home as bearing on the issue of establishing a statutory ground for termination; In re Jessica M., supra, at 466.
 IV
Little is known of the children's father Nathaniel S. He resides in the New Haven area. He has had no contact with these children since their commitment to the care end custody of the Commissioner in December of 1989. He has never contacted DCYS. Joshua may have some memory of father. Billy Jean "knows" father "is on drugs" and that he used to fight with mother. Nathaniel has no recollection of father. There is no evidence that any of the children have positive feelings toward Nathaniel S.
The petitioner has established by clear and convincing CT Page 5001 evidence that Nathaniel S. has abandoned these three children in the sense that he has failed to maintain a reasonable degree of interest, concern, or responsibility as to their welfare; further, by clear and convincing evidence, the children were found in prior proceedings to have been neglected and (in the cases of Billy Jean and Joshua) uncared for and father has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of each child, father could assume a responsible position in the life of these children or any one of them. By clear and convincing evidence, each of the said children has been denied by reason of acts of commission or omission by their father the care, guidance and control necessary to the children's physical, educational, moral and emotional well-being. As a non-custodial parent, there is no evidence to suggest that Nathaniel S. made any effort to be supportive of these children in any way. Again, by clear and convincing evidence, there is no parent-child relationship between Nathaniel S. and any of the three children, and to allow further time for the establishment of such relationships would be detrimental to the interests of each child. Nathaniel S. has never met, on a continuing, day-to-day basis the needs of any of these children. Nathaniel, Jr. has no memory of his father. Billy Jean and Joshua have no positive feelings toward father.
The above-mentioned grounds for termination have existed for not less than one year.
 V
Billy Jean first came to the attention of this court on June 11, 1985 when a petition was filed alleging she was uncared for in that she was homeless. In January of 1985 Billie Jean had been placed voluntarily in foster care. In October, 1985 the child was returned to her mother. On January 9, 1986, by agreement, Billy Jean was adjudicated uncared for and protective supervision was ordered for three months.
On January 19, 1989 petitions were filed on behalf of Billie Jean and Joshua, alleging the children to be neglected and uncared for. On October 23, 1989, by agreement, Billie Jean and Joshua were adjudicated neglected and uncared for. On October 31, 1989 a request for an Order of Temporary Custody and a petition alleging neglect were filed on behalf of Nathaniel S. On December 11, 1989, Nathaniel was adjudicated neglected and all three children were committed to the care and custody of the Commissioner. On May 29, 1991 these commitments were extended to December 11, 1992. Billie Jean and Joshua were placed with their current foster mother, Ramona M., in January, 1990, at Theresa M's request. Nathaniel joined his brother and sister in June, 1991 and the children remain with Ramona M. today. Ramona M. is Theresa's CT Page 5002 former social worker. Both Joshua and Nathaniel are characterized as children with special needs. Both are developmentally delayed but have progressed since placement with Ramona M. Joshua was particularly delayed in the area of speech, had, in 1988, displayed self-destructive behaviors, has a short attention span, and can be physically violent. Both boys are receiving services designed to meet their special needs.
 VI
Theresa M. has experienced many difficulties in her life. One of her 5 children died. Her parental rights in and to another child were terminated in 1985. She has had psychiatric problems over the years and one of her case workers (Mr. Roseberry) testified to his belief that said problems significantly impaired her ability to parent her children. Homelessness has been a chronic problem for Theresa. Since the children's commitment in December, 1989 mother has been unable to establish housing arrangements suitable for a family although her attorney in her post-trial memorandum indicates mother has now obtained an apartment.
Repeated efforts have been made by DCYS and other agencies to supply mother with services designed to assist her in parenting. Over the years there has been a pattern of resistance by mother toward services offered her and her children and rejection of such services.
In his testimony Mr. Roseberry described the situation as it existed at the time of filing the OTC in November, 1989. The children appeared dirty, undernourished, apathetic, "very needy"; mother's landlord was threatening eviction due to mother's inability or unwillingness to keep her apartment in sanitary condition. These conditions were consistent with Mr. Roseberry's observations during prior visits to mother's apartment in 1989. Mother opposes therapy for the children. Mother opposes schooling for the children.
Mother has refused to participate in court-ordered evaluations, including the evaluation ordered on May 29, 1991 in connection with the instant petition. Mother entered into a service agreement with DCYS on March 3, 1989 and failed to comply with key provisions:
(1) Participate in Parent Education at the Consultation Center. Mr. Roseberry took mother for one session. Counselors refused to accept mother into the program, deeming her disruptive.
(2) Consent to and participate in a Development assessment of Joshua by Newington Children's Hospital; Mother cancelled twice CT Page 5003 and never participated in such assessment. This is consistent with her persistent refusal to recognize that any of her children have special needs. When the DCYS worker arrived to transport mother to the assessment, she refused to go.
(3) Accept the services and recommendations of a Parent Aide from the Coordinating Council for Children in Crisis ("4Cs"): Mother refused to allow 4Cs into her home.
(4) Submit to a psychological evaluation of herself and Billy Jean; mother was taken by Mr. Roseberry to one session at Yale Child Study Center and thereafter refused to attend.
The court is satisfied that DCYS did make good faith efforts to adhere to its part of the bargain as stated in term 6 of the service agreement. "(6) DCYS worker will make appropriate referrals, co-ordinate appointments, provide for transportation and insure (sic) compliance with regard to this agreement."
Mother entered into court-ordered Expectations at the time of the children's commitment in December, 1989. She has failed to comply with key provisions of said Expectations. These provisions included: mother to participate in children's evaluation at Yale Child Study Center. She did not do so. Mother was to engage in out-patient therapy and follow through on recommendations: she has not done so.
Notably, mother agreed to visit the children as often as permitted; "supervised visitation at DCYS leading to supervised visitation in home setting." Since commitment of the children in December, 1989 mother has visited the children 4 times. The children do not look forward to these visits and are unresponsive in the course of the visits. Mother's last visit was in August, 1991 and she has not requested another visit since then.
Since the children were placed, they have made significant progress. Since placement, mother has made little or no progress in equipping herself to function as a responsible parent.
 VII
In the subject petition the Commissioner has alleged that mother has abandoned her children in the sense that she has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the children. The court finds petitioner has failed to establish abandonment by mother by clear and convincing evidence.
As indicated, the children have been found in prior proceedings to have been neglected. Testimony has established by CT Page 5004 clear and convincing evidence that mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of each child, that mother could assume a responsible position in the life of these children or any one of them. "Personal rehabilitation" here means the restoration of a parent to his or her constructive and useful role as a parent. In re Migdalia M., 6 Conn. App. 194, 203; In re Joshua Z., 26 Conn. App. 58,64.
The Commissioner alleges that the children have been denied by reason of act or acts of commission or omission the care, guidance or control necessary for their physical, educational, moral or emotional well-being. As a non-custodial parent mother's opportunities to exert such care, guidance or control have been limited; nonetheless, mother has failed to utilize such opportunities. Her acts of omission or commission, however, have not denied the children the desired care, guidance or control only in that the children's caretakers have supplied the needed care, guidance, or control since their commitment. The court finds the State has failed to establish this ground for termination by clear and convincing evidence.
The Commissioner further alleges that there is no on-going parent-child relationship between mother and any of the children which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of a child and that to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of each of these three children. Billy Jean and Joshua show no interest in or positive feelings or emotional ties toward their mother. Nathaniel does not recognize Theresa as his mother. The children, according to their foster mother, do not speak of their mother. In the past when Billie Jean and Joshua mentioned mother, it was to relate their deprivation while living with mother. Billy Jean and Joshua do not wish to go to visit their mother. Their behavior deteriorates following visits. The court finds that the petitioner has established, by clear and convincing evidence, that there is no on-going parent-child relationship between Theresa M. and any of the three children. Given Theresa's long-standing inability to parent these children; her lack of progress in rehabilitating herself; her resistance to efforts to provide her with needed services; her inability to recognize the special needs of her children, the petitioner has established by clear and convincing evidence that to allow further time for the establishment of re-establishment of such parent-child relationship would be detrimental to the best interest of each of these children. CT Page 5005
The court finds by, clear and convincing evidence, that the grounds established have existed for not less than one year.
 VIII
The grounds for termination having been established, the court makes the following 6 findings, by clear and convincing evidence, as required by General Statutes, 17a-112 (d):
(1) DCYS offered mother referrals for in-home services such as VNA and 4Cs; referrals to 4Cs; referrals to Family Support Services, to the Consultation Center, to Newington Hospital (developmental delay assessment for Joshua); to Yale Child Study Center. Three bus passes were provided mother. Transportation was offered or provided mother for referrals and visits. Visits with the children were offered and provided. Mother was given referrals for furniture and clothing. Some effort was made by DCYS to assist mother in obtaining housing. Mother was unable or unwilling to avail herself of these services, with the exceptions previously noted.
Father has never contacted DCYS, has never acknowledged paternity and his whereabouts are unknown. No services have been provided to him.
DCYS acceded to mother's request by placing the children with Ramona M.
(2) Mother has failed to comply with court-ordered Expectations entered into by her on December 11, 1989. She has refused to participate in the psychological and psychiatric evaluations ordered by the court on May 29, 1991.
There were no court orders entered into by father.
(3) The children show no positive feelings and emotional ties toward biological mother. Billie Jean does call Theresa "Mom".
The children show no feelings or emotional ties toward father, who has had no contact with them for years.
The children have positive feelings and emotional ties toward Ramona M., their foster mother. There is a psychological parent bond between Ramona M. and Billie Jean and between Ramona M. and Joshua. Nathaniel (September, 1991) shows signs of developing affection and responsiveness to Ramona M.
 (4) Billie Jean is approximately 8 years, 2 months old. Joshua is approximately 5 years, 8 months old. Nathaniel is approximately 3 years old. CT Page 5006
(5) Father has made no effort to adjust his circumstances, conduct or conditions to make it in the best interests of the children to return them to father in the foreseeable future.
Mother's efforts have been woefully inadequate. She has visited the children four times since their commitment. She brings them sweets when visiting. She has refused, cancelled or failed to show for other visits. She contacts Ramona M. by telephone once or twice a month to inquire as to the children. Mother brought gifts to the children on her December 18, 1990 visit. Sarah Douglas of the Center For Independence And Access testified that since August, 1991 mother has worked cooperatively and pleasantly with the Center to obtain housing and counselling.
(6) Mother has not been prevented from maintaining a meaningful relationship with any of the children by the unreasonable act of any person or by her economic circumstances. While poverty has exacerbated mother's many difficulties it was not the cause of mother's failure to maintain a meaningful relationship with her children.
 IX
Disposition: Billie Jean and Joshua have been in and out of foster care since 1987. Ramona M.'s home is Billie Jean's fourth placement. Nathaniel has been in foster care since he was just over 6 months old. Both boys are developmentally delayed and need special care. Billie Jean is developmentally on target but requires on-going therapy. The three children have found a warm and loving home with Ramona M. All three children have made great strides since placement with Ramona. Their present condition stands in dramatic contrast to their condition while in Theresa's care. Testimony established that these children were pathetically deprived while in Theresa's care, not only of material needs but of nurturance. There is no reason to believe mother could remedy her deficiencies as a caretaker in the foreseeable future.
Ramona M. has proven herself to be a skilled and loving caretaker. She loves the three children and wishes to adopt them. The children show warmth and affection toward Ramona. The court concludes, by clear and convincing evidence, that it is in the best interests of Billie Jean, Joshua and Nathaniel that their mother's and father's parental rights be terminated in order that the children be freed for adoption.
Accordingly, the parental rights of Nathaniel S. and Theresa M. in and to their children, Billie Jean, Joshua M., and Nathaniel S., are terminated. CT Page 5007
The Commissioner of the Department of Children and Youth Services, is appointed statutory parent for the purpose of arranging for the adoption of these children and is directed to file the report required by General Statutes, 17a-112 (i) within 90 days of this decision and thereafter every twelve months until adoption is effected.
 X
Trial counsel for respondent is appointed appellate counsel, should respondent wish to take an appeal of this decision. Should counsel decline to perfect an appeal, she is to notify the clerk promptly and file a motion for extension of time. Upon such notification, a second attorney will be appointed to review the file to determine if grounds exist for appeal. If said second attorney declines to perfect an appeal, she should notify the clerk promptly. The clerk then should notify respondent promptly of the second attorney's position indicating respondent is free to obtain counsel to take an appeal, which counsel may be appointed by the court if requested, and further indicating to respondent the balance of time remaining in which to take an appeal.
JOHN T. DOWNEY, JUDGE