[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The petitioner, Commissioner of the Department of Children and Youth Services (DCYS), pursuant to Connecticut General Statutes 17a-112, filed petitions on January 23, 1992, to terminate the parental rights of respondents William J. and Linda J. to their sons, William J., Jr., born November 22, 1982 and Daniel J., born March 1, 1986. On November 29, 1988, Linda stabbed Daniel over 20 times and attempted to run over both boys with her car while the father was at work. CT Page 3331 Daniel was taken to Windham Hospital and transferred to Hartford Hospital and his wounds were extremely serious and life threatening. William, Jr., who witnessed the stabbing and sustained contusions and abrasions, was also being treated for shock at the hospital.
When the respondent father wished to take William, Jr. home over the objections of the treating doctor, a `96-hour hold' was placed on him and a referral to DCYS was made. When DCYS and father could not agree on a temporary placement for William, Jr., DCYS obtained an order of temporary custody (OTC), and shortly after, placed both children with Georgia R., the boys' maternal aunt. DCYS eventually licensed her as a foster parent, and the boys have continuously resided with her throughout these proceedings.
On December 2, 1988, DCYS filed petitions alleging that both children were neglected and each parent, represented by separate counsel, entered nolo contendere pleas to the petitions on July 27, 1989. The court (Potter, J.) found that both boys were neglected on "count one" of the petitions which alleged as to each child that he had been abused in that physical injury has been inflicted upon him other than by accidental means. By agreement, both children were committed on December 7, 1989 to DCYS for eighteen months. On April 16, 1991, the court (Walsh, J.), after a hearing at which father failed to appear, extended the commitments for an additional eighteen months, effective June 7, 1991, and the commitments were again extended on November 3, 1992 for a third eighteen month period, effective December 7, 1992. Georgia R., the aunt and foster mother, upon motion, was permitted to intervene as a party as to dispositional matters only. The respondent mother was arrested and was ultimately found not guilty by reason of insanity, of the attack on her children, and was committed to the Psychiatric Security Review Board and has been, and still is, hospitalized at Norwich State Hospital. On July 20, 1992, the first day of trial, mother consented in writing to the termination of her parental rights as to each child and the court found that her consents had a factual basis, and were entered knowingly, voluntarily and understandingly and with the capable and effective assistance of counsel and accepted her consents. The respondent father maintained his denials as to both termination petitions and the case was heard on July 20, 1992; September 30, 1992; and November 4 CT Page 3332 and 18, 1992. All parties (except mother) filed briefs; DCYS and the children's attorney urged termination of the respondent father's parental rights.
 I.
In its petitions, DCYS has alleged as to each child that the reasons for the termination of the father's parental rights had existed for not less than one year, and that his rights should be terminated for three of the four grounds provided in 17a-112(b), specifically: (2) that each child in a prior proceeding had been found to have been neglected or uncared for, and that the parent had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of each child, he could assume a responsible position in each child's life; (3) that each child has been denied by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being; and (4) there is no ongoing parent-child relationship. DCYS may prevail if it proves any one of these statutory alternative grounds by clear and convincing evidence.
Our Supreme Court has often and recently said:
 "The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent. . . . Although . . . ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children undeniably warrants deference and, absent a powerful countervailing interest, protection. Termination of parental rights is a most serious and sensitive judicial action. . . . In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact CT Page 3333 usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun. No all-encompassing best interests standard vitiates the requirement of compliance with the statutory criteria."
In re Barbara J., 215 Conn. 31, 44-45 (1990) (Internal citations and quote marks omitted.) It is in the light of these overarching principles that the court measures and weighs the evidence.
 II.
The court received in evidence numerous documentary exhibits and heard testimony from the following witnesses: Marilyn Eichler, Ph.D., a licensed psychologist, who performed a court-ordered psychological evaluation of the father, Georgia R. and both children; Richard B. Sadler, M.D., a psychiatrist who performed a psychiatric evaluation of the children, the respondent parents and Mr. and Mrs. R.; Deborah McGeehan, Ph.D., a licensed psychologist, the therapist for both children; Peter Stahl, Anne Marie Daley, Pamela Deary, Roxanne O'Brien and Patricia Marchand, DCYS social workers; and Priscilla Capstick, a neighbor of the parents. The father, mother, Georgia R. and the children did not testify. The documentary evidence included a detailed three-page service agreement between father, Georgia R. and DCYS; a court-ordered list of expectations; a social study prepared by Peter Stahl of DCYS, an addendum to the social study prepared by Patricia Marchand; the reports of Drs. Eichler, McGeehan and Sadler; a one-page letter from Dr. Moyer; Dr. McGeehan's progress notes and Mrs. R.'s reports to DCYS. The court was also requested to and did take judicial notice that the children were adjudicated as neglected on July 27, 1989. From this evidence, the court finds the following facts:
On November 28, 1988, Linda J., the mother of William, Jr. and Daniel, then aged 6 and 2 1/2 respectively, was being treated for mental illness and was `acting strangely'. This was reported by father to her clinic United CT Page 3334 Services, who scheduled an appointment for an evaluation which was not kept. On the evening of the 28th, father called in some parishioners from the church he belongs to and regularly attends to pray over her. The next morning, father went to work, although the mother's condition had not improved. The mother had sustained a head injury in 1980 and had been hospitalized several times for psychotic behavior, which included hallucinations and delusions, apparently as a result of her failure to regularly take her prescribed medications. There was some evidence that mother had physically and verbally abused both of the boys before November 29, 1988, and she accused father of physically abusing her and the boys in the past. When this came to the attention of DCYS, in 1987, specific details of the abuse could not be confirmed, and DCYS closed its file without providing any services to the family.
On November 29, 1988, while father was at work, mother stabbed Daniel more than 20 times and attempted to run over both children with her car. Both boys were taken to Windham Hospital where Daniel was given emergency surgery and then transferred to Hartford Hospital by Life Star helicopter. William, Jr., although not seriously physically injured, was being treated for shock. When the father insisted on taking William, Jr. back to the family home, which remained both filthy and bloody, DCYS was called by the doctor and commitments of each child ensued, which continue in effect to the present.
When commitment of each child to DCYS for eighteen months was ordered by agreement of the parties on December 7, 1989, a comprehensive service agreement was reached among father, Georgia R. and DCYS. Among other things, it provided for: father to participate in counseling, the terms and conduct of his visitation under various circumstances, his visitation schedule and the conduct of his relationship with the Rs. The Rs. agreed to care for the children, cooperate with the father's visitation and not disparage the father or his church in the presence of the children. DCYS also agreed to monitor the situation, be available for consultation to the parties, monitor the children's behavior after father's visits and assist father with obtaining counseling. Before the commitment to DCYS, and while the boys resided with the Rs., the father had visited the children in the R. home on almost a nightly basis, and prayed with them and put them to CT Page 3335 bed.
Dr. Eichler examined the father, the Rs. and the children during August and September 1989, and had access to various DCYS reports. She also saw the children in the R. home. She found that Georgia R. had spoken very negatively about father's parenting ability, his religious commitment and his ability to relate to the children. She found both children well cared for and that both had psychologically bonded with the Rs. and were happy in their home. She described the father as heavily relying on his religious community for support and direction in dealing with his external world, and without such support and direction, she believed that the father would be `lost'. She concluded that although the father's interaction with the children was `happy and nice' and father and children had a strong emotional bond, that the father did not have the flexibility to respond to the "varied needs of the children who have been so severely traumatized". During one session, she noted that the father began to discuss religious issues intensely, and that this disengaged the children from their interaction with father. She further concluded that the father does not understand the needs of his children or protection, support and attention to their emotional condition and that his church, rather than his children was the center of his concern.
Dr. Sadler found that both boys clearly understood that William J. was their father, although they appeared frightened of him, when he saw them on June 2, 1992. Dr. Sadler had access to the prior social studies, Dr. Eichler's report and Dr. McGeehan's reports. He concluded that: the father did not understand his sons' emotional needs, that his sons' feelings for him were predominantly negative; that the respondent did not understand what his sons had to deal with or how to help them and that it was exceedingly unlikely that he would ever be able to meet his sons' emotional needs and that it was in their best interests to be adopted based on their special needs under the circumstances. He noted that the boys showed no fear of their father during the session, enjoyed the interaction with him and had positive feelings for their father, especially William. He also observed that the boys were clearly happy to see their father, and recommended that father be involved in the children's lives and not be totally excluded from them. He also noted that CT Page 3336 the Rs. have hostility for the father and that both children identify the Rs. as their emotional and psychological parents. He finally concluded that whatever benefit could be provided by father's continued involvement with the children would be outweighed by the assurance and security of adoption, and that the children should not be allowed to live with their father.
Dr. McGeehan first began to see the children on February 6, 1990, over a year after DCYS had obtained temporary custody, and by the time trial commenced had seen each boy over 30 times. Georgia R. brought the boys to each of the sessions, and two were conducted jointly with the children and the father. Dr. McGeehan discussed the father and the children with Mrs. R., and all of the information she received from Mrs. R. about father was negative. Dr. McGeehan could not recall a single favorable or positive statement by Mrs. R. about the father, although she claimed she saw no interference by Mrs. R. with the father's relationship with the children. McGeehan also met once with Dr. Moyer, father's therapist.
Dr. McGeehan noted that William, Jr. wanted to see his father less, that he wrote a letter to his lawyer in 1991 stating that he wished to see his father once every five years, and also that he did not want to see his father at all. The boy related to Dr. McGeehan that father had told his sons a story about sacrificing a lamb and blood, which frightened them. Father did not understand the inappropriateness of the story in the context of the boys' traumatic experience. William, Jr. also told McGeehan that he wished to stop going to church with his father, that he was nervous when alone with his father and frightened of his father's anger. Both boys had anxiety about their father and were not forthcoming in their statements to her about him, as they were frightened about what he might do if father learned what they said. Indeed, she noted that the father had made threatening statements to them. She observed that the two joint sessions with the father and both children were extremely stressful and upsetting for the children. In fact, Daniel hid in a closet for a time and also under her chair. She concluded that the father had no understanding or appreciation of the trauma to the boys and the effects upon them, and that he did not and could not meet their emotional needs. She also concluded that the children were afraid of CT Page 3337 him.
Both children improved markedly in the care of Mrs. R. with the therapy and the passage of time. Although, initially, Dr. McGeehan recognized that evaluating and improving the boys' relationship with their father was one of her goals, she came to the conclusion, early on, that the goal of reunification with him was not realistic. Primarily because of her recommendations, the father's rights of visitation were markedly decreased and eventually became limited to supervision in the R. home. She made this recommendation even before she had a meeting with Dr. Moyer, who began counseling father in May of 1990 and terminated father's counseling in June 1991. Unfortunately, although father had 18 sessions with Dr. Moyer, no effective attempt was made by DCYS to outline any treatment goals for father with Dr. Moyer.
Although the record is clear that father was resistant to therapy and failed to see the use or need for it, after DCYS specifically agreed to assist father in obtaining counseling in December 1989, it is incomprehensible why father did not begin counseling until May 1990, over one-and-a-half years after these tragic events. It is also beyond comprehension why counseling was not offered to father at the outset of this case at least in order to deal with his own traumatic issues, even though DCYS claimed it was "waiting" for evaluations.
Dr. Moyer did not testify, but his report indicated that the father was making minimal progress in counseling, that father was frustrated over the legal process, and that father believed that continuing counseling sessions were fruitless. Moyer's treatment was terminated for a number of reasons, including father's financial difficulties, and father sought no further counseling, even though he was represented by counsel. DCYS did not offer to pay for counseling, but several DCYS social workers continued to urge it upon father.
Father visited the children on a substantially regular basis throughout these proceedings. He brought gifts for the boys on occasion, including clothing and things for school. He came to William, Jr.'s soccer practice and other school events, and until his visitation became supervised and CT Page 3338 reduced to one evening a week for two hours in the R. home, he spent a lot of time with the children.
During the proceedings, five social workers had responsibility for this family during various periods of time. None of the social workers made an opportunity to observe the children with their father, or within a short time after a visitation with their father. The testimony of the various social workers when taken together with Mrs. R.'s notes and reports compel the court to conclude that approximately 25 percent of the visitations father had with the children went well, but that many others did not.
 III.
The court in the light of these facts and other facts applicable to the specific grounds alleged, now turns to each in turn.
A. Failure to Rehabilitate
Section 17a-112(b)(2) authorizes a court to grant a petition to terminate parental rights if it finds that "the [parent] of a child who has been found by the superior court to have been neglected . . . in a prior proceeding [has] failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, [the parent] could assume a responsible position in the life of the child. In re Michael M., 29 Conn. App. 112, 123 (1992). Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. Section 17a-112(b)(2) requires the trial court to analyze the father's rehabilitative status as it relates to the age and needs of the particular child, and further, to determine whether his rehabilitation is foreseeable within a reasonable time. See In re Luis C.,210 Conn. 157 (1989).
It is also important to point out that our courts have not equated the failure of strict compliance with court expectations to a failure to rehabilitate. Id.
The court finds that the children have been found in a prior proceeding to have been neglected. CT Page 3339
The court further concludes by the clear and convincing evidence presented that the respondent father has failed to rehabilitate himself within the meaning of the statute, and that his rehabilitation is not foreseeable within a reasonable time considering the age and needs of the children. The court bases this conclusion on a comparison of the father's situation at the time DCYS obtained custody with the conditions existing as of the date the termination petitions were amended. Shortly after the attack, while William, Jr. was being treated for shock, father insisted that the boy, then barely six years old, come home with him to a still bloody and filthy home. At that time, although father may have been in shock himself, it was clear that he did not fully understand the effects of the trauma upon his sons nor what they would need to deal with to overcome it. Almost one year later, in September, 1989, he still was not able to understand the emotional needs of the boys as determined by Dr. Eichler, who concluded: "[Father] was aware of his wife's long history of emotional problems, yet he did not judge to protect his children when he had doubts about her ability to function as a parent. At present, he still does not appear to understand the needs of his children for protection, support and special attention to their emotional needs." Dr. Eichler recommended counseling for the father.
Dr. McGeehan, who began treating the boys in 1990, had an opportunity to see both boys at two sessions jointly with the respondent. She noted that respondent father's therapist, Dr. Moyer, described him as having minimal awareness of the fears and needs of his children. She described the severe anxiety of both boys at these sessions, and terminated further joint sessions with father believing they were harmful to the children. William, Jr., in particular, was agitated about his father, claimed that he felt sick when in his father's car and resisted going with him. William, Jr. also feared for Daniel's safety and was frightened about having to talk with his father for fear of what the father would do or say. She also concluded that the father had no insight or awareness of the children's emotional needs. It was also her opinion that he still had no appreciation or understanding of the effect the trauma had on the children and he could not meet their emotional needs, and she concluded that visitation with the father was more CT Page 3340 harmful to them than beneficial and recommended their adoption in the R. home to provide safety, protection and security for them.
Dr. Sadler, a psychiatrist appointed by the court to evaluate the family and who did so in June of 1992, concluded that both boys were frightened of their father and had predominantly negative feelings about him. Dr. Sadler also concluded that the father was still unable to understand what the boys had to deal with and how to help them, and that it would be exceedingly unlikely that the respondent would be able to progress to a point where he could meet their emotional needs. He further concluded that the respondent does not understand his children or their emotional needs and also recommended their adoption, as it was his opinion that whatever benefit father could provide would be outweighed by the assurance and security of adoption.[1] Dr. Moyer's statement to Dr. McGeehan essentially agrees, and his report indicated that respondent made minimal progress. Courts may give great weight to expert psychological and psychiatric testimony in parental termination cases. In re Nicolina T.,9 Conn. App. 598, 605, cert. den., 203 Conn. 804 (1987). The court finds that this testimony is credible, clear and convincing, and concludes that despite the lapse of over three-and-a-half years between the time of this tragic onset of events in 1988 and July of 1992, respondent made no discernible improvement in understanding the trauma, its effects on his sons and their emotional needs. His efforts toward such improvement were less than minimal. Although he counseled with Dr. Moyer for more than one year, his visits were about three weeks apart, although weekly sessions were urged. Dr. Moyer offered to continue counseling, and this offer was not accepted by father. Several DCYS workers urged counseling upon him, and he resisted it. Moreover, he was represented by counsel who could have assisted him in finding other forms of self-examination and evaluation including psychological or psychiatric assistance, group therapy, pastoral or religious counseling, parenting instruction, or the like. And, even when the termination petitions were filed in January of 1992, the respondent made no effort to improve his understanding of his children, by any method. Hence, it is evident that as the past is the best predictor of the future, it is very unlikely that the father would be able to rehabilitate himself within a reasonable time, considering the ages and needs of the children. CT Page 3341
The expert testimony is corroborated by a litany of events relating to respondent's interactions with his sons, such as the sacrificial lamb and blood story, and "blood of Jesus" songs, both highly inappropriate in the context of this case. He has also stated several times that the boys would get over it in time [the attack] and urged William, Jr. to make a birthday card for his mother. He also told the children that their family would be together soon (meaning their mother would come home), and has often exhibited angry and emotional outbursts directed at the boys, which frightened them. These included such acts as spitting in Daniels's face, putting his face in the boys' faces, pinching William, Jr.'s toe, stepping on his wrist and the like.
In the words of Dr. Sadler: ". . . [A]fter three and one-half years of his children in foster care . . . [father] showed no signs of having better understood the issues confronting himself and his two sons at this time than he has in the past. While [he] has made several cosmetic changes to his behavior over the years, [he] has pursued no effective change in his behaviors or his relationship with his sons. [He] is profoundly unaware of his or his sons' emotional state. [He] functions with an approximately average intelligence and an important emotional disability which has led him to blame everyone except himself for the tragedy confronting his sons. [H]e is developing a better household budget with his pastor while he fails to understand why his visitation has been decreased with his sons and why his sons are afraid of him and what he can do to help them recover from their traumas." Petitioner's Exhibit 6, p. 14 (emphasis provided). The court further finds by clear and convincing evidence that this ground has existed for not less than one year.
B. Parental Acts of Omission or Commission
Section 17a-112(b)(3) provides:
"[T]he child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well being. Non-accidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental CT Page 3342 commission or omission sufficient for the termination of parental rights. . . ."
The petitioner appears to claim in her brief that essentially the same facts she has alleged and proved under the failure to rehabilitate ground constitute the predicate acts of commission or omission. This court disagrees. While it may have been possible for the petitioner to file at the outset coterminous petitions pursuant to 17a-112(b)(2) and (e) and prevail as to both parents (See In re Theresa S.,196 Conn. 18 (1985), a case strikingly similar on its facts to the case at hand), she chose not to do so, but filed and prevailed upon neglect petitions, and obtained a commitment of each child. DCYS is precluded from using father's conduct prior to the neglect adjudication to prove this ground, without supervening new facts. See In re John B., 20 Conn. App. 725
(1990), a termination case where a prior termination petition was dismissed; In re Nicole D., Superior Court, Juvenile Matters, J.D. Hartford-New Britain, Memorandum of Decision dated May 20, 1991, Docket No. ___ (Brenneman, J.). Both children have been in DCYS' legal custody uninterruptedly beginning shortly after the savage attack on them. Hence, the acts of parental omission or commission the petitioner points to, namely, his insensitivity to the emotional needs of the children, his lack of understanding and his conduct, alone or taken together with and additional to the events resulting in their original commitments to DCYS, have not resulted in the "denial of the care, guidance or control necessary for [the children's] physical, educational, moral or emotional well being." All of these have been met by DCYS and their foster parent, Georgia R. The petitioner has failed to prove this ground by clear and convincing evidence and it is dismissed.
C. Lack of Ongoing Parent-Child Relationship
Section 17a-112(b)(4) requires the petitioner to prove that there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. CT Page 3343
This requires the court to undertake a two-pronged analysis. "First, there must be a determination that no parent-child relationship exists; and second, the court must look into the future and determine whether it would be detrimental to the child's best interests to allow time for such a relationship to develop." In re Megan M., 24 Conn. App. 338,340 (1991).
"The statutory term "no ongoing parent-child relationship" has been interpreted "to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced. (citation omitted). . . In determining whether there is an ongoing parent-child relationship, the court should consider the feelings of the child toward the parent, especially if those feelings are positive rather than negative." Id. 341.
". . . [T]he ultimate question is whether the child has no present memories or feelings for the natural parent." In re Juvenile Appeal (Anonymous), 177 Conn. 648, 670 (1979).
Our Supreme Court has recently refined this standard in In re Jessica M., 217 Conn. 459, 470 (1991), where the court said in the context of a child in the custody of foster parents who wished to adopt her and were hostile to the position of a natural parent, as here: ". . . [W]e agree that the standard [no ongoing parent-child relationship] contemplates a relationship that has some positive attributes. It is not unlikely that most parent-child relationships in which state intervention is required, including custody disputes incidental to divorce, will exhibit signs of strain. While evidence of a child's ambivalent feelings toward a non-custodial parent would not alone justify a finding that `no ongoing parent-child relationship' exists, it is nevertheless reasonable to construe this statutory ground for termination to require a finding that no positive emotional aspects of the relationship survive." Id., 470 (emphasis provided).
Here, both children clearly know their father and recognize him. They were taken from his custody under traumatic circumstances. Yet, both Drs. Eichler and Sadler CT Page 3344 found that there were emotional bonds between the boys and the respondent. Dr. Sadler even noted that they were happy to see him. The father has consistently visited with the boys, albeit now supervised, and on approximately 25 percent of the visits, as reported by Mrs. R., an adverse party, the visits went well. On the state of this record, measured by the standards previously enunciated, the court cannot find by clear and convincing evidence that there are no positive emotional aspects in the father's relationships with each boy.
Accordingly, the petitioner has failed to prove this ground and it is dismissed.
 IV.
Having found that the petitioner has proven by clear and convincing evidence the ground of respondent father's failure to personally rehabilitate, the court must now consider the six factors set forth in 17a-112(d) before deciding whether his parental rights may be terminated.
(1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent.
DCYS provided court-ordered evaluations by Yale Child Study Center and Dr. Eichler. It provided psychological therapy for both children. It urged father to attend counseling. It provided for visitation. It provided treatment plans and was available to consult about them with father or his attorney. It failed to offer father any instruction or training in the improvement of his parenting skills. It entered into a service agreement with father and Georgia R. to provide for the care and nurturing of the children, and its social workers were available for consultation and assistance. However, its provision of counseling to both the children and father were unjustifiably delayed under the circumstances and it wholly failed to provide counseling or other form of mediation between Mrs. R., the foster mother, and respondent father to assist them in dissipating their mutual hostility to lessen the strain in the custodial arrangement.
(2) The terms of any applicable court order CT Page 3345 entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
The service agreement dated December 7, 1989 was made a court expectation. None of the parties wholly complied with it. Father, by not entering and remaining in and cooperating with counseling, failing to be sensitive to the children's feelings, failing to personally supervise William, Jr. fully at church, and failing to be prompt and consistent for his visitation, the Rs. by limiting father's visitation schedule. DCYS was required to monitor the children's behavior after visits with father. If DCYS did so, it was indirectly through Mrs. R. In a situation where the Rs. and father were mutually hostile, DCYS social workers should have made diligent efforts to see the children personally, either shortly after or during visits, and not wholly rely on Mrs. R.'s observations.
The expectations of March 1, 1991 were made court orders. Father only partially complied with them and substantially failed to comply by discontinuing his participation in counseling. In fact, he saw no need for it, thought it was useless and resisted it. He eventually terminated counseling shortly after. He visited the children as often as permitted by DCYS, missed some visitation and was late for others. DCYS wholly complied with these expectations.
(3) The feelings and emotional ties of the child with respect to his parents and guardian of his person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties.
Both boys view the Rs. as their psychological parents, and have established a warm, loving bond with them. They look to them, Georgia R. in particular, for their care, comfort, safety, guidance and for anything and everything they need.
Each boy has both positive and negative feelings toward his father. They have emotional ties to him and know that he is their father. They fear him and are intimidated by him, although they can play games with him and spend some CT Page 3346 time with him and enjoy the visitation when in a supervised setting. Both boys wish to live with Georgia R. and to be adopted by her.
(4) Age of the children.
William, Jr. is ten; his date of birth is November 22, 1982.
Daniel is now seven; his date of birth is March 1, 1986.
(5) The efforts the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Father has maintained contact with the boys and Georgia R. by almost regular visitation at the R. home. He has provided occasional gifts and things for school and the like. On November 18, 1992, the court ordered father, who was then employed at two jobs and earning $175 per week, to pay $7.50 per week per child as support, a total of $15 per week secured by a contingent wage execution. Before that date, father paid no child support while the children were in the custody of DCYS. His contact with DCYS was irregular and he moved on at least one occasion without providing a new address or telephone number.
(6) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.
On this point, the father in his brief claims that the mother's unprovoked attack prevented him from maintaining that relationship with his children. This is consistent with his stance with DCYS and the testimony of the psychologists CT Page 3347 and the psychiatrist, that is, a total denial of his own responsibility and lack of judgment in failing to get his wife to a hospital or doctor for immediate treatment when he knew she was delusional and ill; or to bring the children to a babysitter, or obtain a responsible person to supervise the family situation while he went to work, or take any reasonable step whatsoever to protect his children and family.
Father also claimed that DCYS' actions in failing to provide him with parenting skills, reducing his visitation and placing the children with Georgia R. have also prevented the maintaining of a meaningful relationship with his sons.
The court agrees that DCYS had a duty to provide supportive services to him to enhance the possibility of eventual reunification of his family. See Connecticut General Statutes 17a-101(a). And it may very well be that better placement to enhance the prospects for reunification would have been a neutral foster home, rather than one hostile to father. However, DCYS was also confronted with the task of providing a safe, nurturing home for the children, and it chose relatives whom the children knew and were familiar and comfortable with in order to lessen the effects of the disruption on the children caused by the severe trauma to which they were subjected. It did not help the situation for DCYS to employ five different social workers on this family's case over a four-year period, one of whom had to relinquish her responsibility as a result of her maternity leave. The other replacements included a social worker who was not even trained as a "treatment worker" which the responsibility required, and cannot be justified except perhaps by plumbing the unfathomable depths of DCYS' bureaucracy. However, there is no evidence that these excessive changes of personnel adversely affected the father's rights or position.
DCYS' reduction of visitation rights directly resulted from strong recommendations by the children's therapist. Although DCYS never offered father parenting classes, neither he nor his attorney requested such; although father claims he could not afford counseling, he made no request to DCYS for financial assistance. Nor did he seek enhanced visitation or any other services by motion to this court or by administrative proceedings pursuant to CT Page 3348 Connecticut General Statutes 17a-15(c). Moreover, the father resisted counseling throughout, and after attending for about one year, refused to continue, although urged by DCYS and others to do so. Under the totality of the circumstances, the court cannot say that the acts or conduct of either DCYS or Georgia R. were unreasonable, and the court also cannot find that father's economic circumstances prevented his maintaining a meaningful relationship with his sons. Nothing prevented father from maintaining a meaningful relationship with his sons except for his own inability or unwillingness to understand their needs.
Having considered the foregoing, it is found to be, by clear and convincing evidence, in the best interests of both children to be assured of the legal certainty, stability and predictability of remaining with Georgia R. and Mr. R., the only adults whom they both have regarded as parents over the past four plus years, and to be adopted by them.
Therefore, as respondent mother has consented to the termination of her parental rights, and the court has found that the father has failed to personally rehabilitate himself within the meaning of 17a-112(b)(2), and that it is unlikely that he will do so within a reasonable time, it is ordered that the parental rights of William J. and Linda J. in and to their children William J., Jr. and Daniel J. be and hereby are terminated.
And it is further ordered that the Commissioner of DCYS be appointed statutory parent for the purpose of giving the children forthwith in adoption to their aunt and uncle, their foster parents, Mr. and Mrs. R.
The court, in considering this specific disposition, has accorded great weight to the wishes and preferences of the children as expressed to their therapist and by their attorney, and in the light of the terrible trauma they have experienced and their resulting needs for stability, safety, predictability and permanency. This is especially so when these children were severely traumatized by their own mother, and their father failed to protect them. At their ages of two and six, their parents were the only adults whom they wholly relied on for their care, security and protection, and their reliance was unavailing. The court has also accorded great weight to the opinions of the CT Page 3349 children's therapist and Dr. Sadler, the court-appointed psychiatric evaluator, who strongly favored this disposition.
The court further orders DCYS to pursue said adoptions with all deliberate speed and without placement of the children anywhere else, or substitution of the present social worker, unless in the event of exigency or emergency or after prior court hearing.
DCYS is further ordered to submit a written report on the progress toward such adoptions no later than ninety days after the date of this judgment and if the adoptions are not then finalized, to submit a Motion to Review Plan for Terminated Child no later than six months after the date of this judgment.
Support orders for said children are terminated.
APPEAL
The father shall have twenty days from the date of this judgment in which to take an appeal. If he requests an appeal and his trial counsel is willing to represent him, this court will appoint that attorney to act as appellate counsel at public expense subject to Practice Book 4017 until all appellate process is completed. If however, in the exercise of professional judgment as an officer of the Superior Court, said attorney declines to perfect such appeal because, in the attorney's opinion, it lacks merit, the attorney is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of forty days as permitted by law. Practice Book 4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The father will then be informed by the court clerk that he has the balance of the forty days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke, 152 Conn. 501 (1965). CT Page 3350
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of third parties involved: those of these severely traumatized children whose interests in achieving permanent nurturing parents are entitled to at least as great a degree of consideration as those of the parent whose right to raise the children is at issue.
Dated at Norwich this 5th day of April 1993.
Teller, J.